Filed 4/2/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S223698 |
| v. | ) | |
| | ) | Ct.App. 1/2 A125542 |
| MARK BUZA, | ) | |
| | ) | San Francisco County |
| Defendant and Appellant. | ) | Super. Ct. No. SCN 207818 |
| _____ | ) | |

In 2004, California voters passed Proposition 69 (Prop. 69, as approved by voters, Gen. Elec. (Nov. 2, 2004); known as the "DNA Fingerprint, Unsolved Crime and Innocence Protection Act" (DNA Act)) to expand existing requirements for the collection of DNA identification information for law enforcement purposes. The DNA Act requires law enforcement officials to collect DNA samples, as well as fingerprints, from all persons who are arrested for, as well as those who have been convicted of, felony offenses. (Pen. Code, § 296.1, subd. (a)(1)(A).)

Defendant Mark Buza was arrested for arson and related felonies and transported to jail. At booking, a jail official informed defendant that he was required to provide a DNA sample by swabbing the inside of his cheek. He refused. A jury later convicted him of both the arson-related felonies and the misdemeanor offense of refusing to provide a specimen required by the DNA Act. (Pen. Code, § 298.1, subd. (a).)

**SEE DISSENTING OPINIONS**

The Court of Appeal reversed defendant's misdemeanor refusal conviction, holding that the DNA Act violated defendant's rights under the Fourth Amendment to the United States Constitution. While the case was pending on appeal, the United States Supreme Court addressed a similar issue in *Maryland v. King* (2013) 569 U.S. 435 (*King*), and reached a different conclusion. The high court held that "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*Id.* at pp. 465–466.)

Following the high court's decision in *King*, this case returned to the Court of Appeal. On remand, the Court of Appeal again reversed defendant's misdemeanor refusal conviction, this time on the ground that the DNA Act violates the California Constitution's prohibition on unreasonable searches and seizures. (Cal. Const., art. I, § 13.)

Defendant raises a number of questions about the constitutionality of the DNA Act as it applies to various classes of felony arrestees. But the question before us is a narrower one: Whether the statute's DNA collection requirement is valid as applied to an individual who, like defendant, was validly arrested on "probable cause to hold for a serious offense"—here, the felony arson charge for which defendant was ultimately convicted—and who was required to swab his cheek as "part of a routine booking procedure" at county jail. (*King*, *supra*, 569 U.S. at p. 465.) Under the circumstances before us, we conclude the requirement is valid under both the federal and state Constitutions, and we express no view on the constitutionality of the DNA Act as it applies to other classes of arrestees. We accordingly reverse the judgment of the Court of Appeal in this case.

2

# I.

## A.

For decades before the DNA Act, California law had required the collection of biological samples from individuals convicted of certain offenses. In 1983, the Legislature enacted legislation requiring certain sex offenders to provide blood and saliva samples before their release or discharge. (Stats. 1983, ch. 700, § 1, pp. 2680–2681, codified at Pen. Code, former § 290.2.) In 1998, the Legislature enacted the "DNA and Forensic Identification Data Base and Data Bank Act," which required the collection of DNA samples from persons convicted of certain felony offenses, including certain sex offenses, homicide offenses, kidnapping, and felony assault or battery. (Stats. 1998, ch. 696, § 2, pp. 4574–4579; Pen. Code, former § 296, subd. (a).)

When the California electorate voted to pass Proposition 69 on the 2004 general election ballot, it substantially expanded the scope of DNA sampling to include individuals who are arrested for any felony offense, as well as those who have been convicted of such an offense. In *People v. Robinson* (2010) 47 Cal.4th 1104 (*Robinson*), this court upheld the expanded DNA collection requirement as applied to persons convicted of felony offenses. The question now before us concerns the application of the DNA Act to persons who have been arrested for, but not yet convicted of, a felony offense.

In its statutory findings and declarations of purpose, Proposition 69 explained that expansion of the DNA databank program was warranted to serve a "critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders and exonerating persons wrongly suspected or accused of crime." (Prop. 69, *supra*,

3

§ II, subd. (b).)  With respect to arrestees in particular, Proposition 69 declared:  "The state has a compelling interest in the accurate identification of criminal offenders"; that "DNA testing at the earliest stages of criminal proceedings for felony offenses will help thwart criminal perpetrators from concealing their identities and thus prevent time-consuming and expensive investigations of innocent persons"; and "it is reasonable to expect qualifying offenders to provide forensic DNA samples for the limited identification purposes set forth in this chapter."  (*Id.*, § II, subds. (e), (f).)

The DNA Act provides that, as of January 1, 2009, all adult felony arrestees "shall provide buccal swab samples, right thumbprints, and a full palm print impression of each hand, and any blood specimens or other biological samples required pursuant to this chapter for law enforcement identification analysis."  (Pen. Code, § 296, subd. (a).)  Providing a buccal swab sample requires the arrestee to apply a swab to the inside of his or her cheek to collect the "inner cheek cells of the mouth," which contain DNA.  (*Id.*, § 295, subd. (e).)  The statute provides that these specimens, samples, and print impressions shall be collected "immediately following arrest, or during the booking . . . process or as soon as administratively practicable . . . but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody."  (*Id.*, § 296.1, subd. (a)(1)(A).)  Refusal to provide any of the required specimens is punishable as a misdemeanor.  (*Id.*, § 298.1, subd. (a).)

Collected DNA samples are sent to California Department of Justice's DNA Laboratory for forensic analysis.  (Pen. Code, §§ 295, subds. (f), (g), (i)(1)(C), 295.1, subd. (c).)  The laboratory uses the samples to create a unique DNA identification profile, using genetic loci that are known as "junk" or "noncoding" DNA, because the loci have no known association with any genetic trait, disease, or predisposition.  (See *King*, *supra*, 569 U.S. at pp. 442–443, 445.)

4

This profile is stored in California's DNA databank. California's DNA databank is part of the Combined DNA Index System (CODIS), a nationwide database that enables law enforcement to search DNA profiles collected from federal, state, and local collection programs. (See *ibid.*; Pen. Code, § 299.6, subd. (b); Cal. Dept. of Justice (DOJ), Bureau of Forensic Services (BFS), Laboratory Services, DNA Analysis, <https://oag.ca.gov/bfs/services> [as of Apr. 2, 2018].) DNA profiles stored by the DNA Laboratory may be accessed by law enforcement agencies. (Pen. Code, § 299.5, subd. (f).) The DNA Laboratory must "store, compile, correlate, compare, maintain, and use" DNA profiles for forensic casework, for comparison with samples found at crime scenes, and for identification of missing persons. (*Id.*, § 295.1, subd. (c).)

Information obtained from an arrestee's DNA is confidential and may not be disclosed to the public. (Pen. Code, § 299.5.) DNA samples and the biological material from which they are obtained may not be used "as a source of genetic material for testing, research, or experiments, by any person, agency, or entity seeking to find a causal link between genetics and behavior or health." (*Id.*, § 295.2.) Any person who knowingly uses a DNA sample or profile for any purpose other than "criminal identification or exclusion purposes" or "the identification of missing persons," or who "knowingly discloses DNA or other forensic identification information . . . to an unauthorized individual or agency" for any unauthorized reason is subject to criminal prosecution and may be imprisoned for up to three years and fined up to $10,000. (*Id.*, § 299.5, subd. (i)(1).) The Department of Justice is also subject to civil damages for knowing misuse of a sample or profile by any of its employees. (*Id.*, § 299.5, subd. (i)(2)(A).)

The DNA Act provides that if an arrestee is cleared of charges and there is no other basis for keeping the information, the arrestee "shall have his or her DNA

5

specimen and sample destroyed and searchable database profile expunged from the databank program." (Pen. Code, § 299, subd. (a).) An arrestee may request expungement if he or she is released without being charged, if all qualifying charges against the arrestee are dismissed, or if the arrestee is found not guilty or factually innocent of all qualifying charges. (*Id.*, § 299, subd. (b).) The federal legislation establishing CODIS likewise requires participating states to "promptly expunge" the DNA profile of any person who is cleared of qualifying charges. (34 U.S.C. § 12592(d)(2)(A).)

The DNA Act includes a broad severability provision. The provision specifies that the invalidity of certain provisions or their application "shall not affect other provisions or applications that can be given effect without the invalid provision or application." (Prop. 69, *supra*, § V, subd. (b).)

**B.**

On the afternoon of January 21, 2009, a San Francisco police officer saw defendant running away from a police car that had burning tires. Police found defendant hiding nearby and searched him. Matches were found in defendant's pocket, a container of oil was found in his backpack, and a road flare and a bottle containing a liquid that smelled like gasoline were discovered in the area where he had been hiding.

Defendant was arrested and taken to county jail. There, several hours after the initial arrest, a San Francisco sheriff's deputy asked defendant to swab the inside of his cheek for purposes of providing a sample of his DNA. The deputy told defendant he was required by law to provide the sample, asked defendant to read a form that described the pertinent requirements, and warned defendant that refusing to provide a DNA sample was a misdemeanor. Defendant refused.

On January 22, 2009, a judge of the Superior Court found probable cause to believe that defendant committed a public offense for which he could be detained,

namely, felony arson in violation of Penal Code section 451, subdivision (d). The next day, the district attorney filed a felony complaint charging defendant with that offense, as well as possession of combustible material or incendiary device (*id*., § 453, subd. (a)), and vandalism (*id*., § 594, subd. (b)(1)). The complaint also charged defendant with misdemeanor refusal to provide a DNA specimen (*id*., § 298.1, subd. (a)). Defendant was arraigned on the same day and pleaded not guilty to the charges.

Approximately three months later, defendant was tried before a jury. Defendant moved for judgment of acquittal on the misdemeanor refusal charge, arguing that the Fourth Amendment did not permit the state to compel arrestees to furnish DNA samples. The court denied the motion. At trial, defendant admitted to setting the police car on fire; he testified that while he regarded setting the fires as a justified protest against government overreach, he knew his act was regarded as illegal. Defendant also admitted to refusing to provide a DNA sample in accordance with Penal Code section 298.1. The jury convicted defendant of all charges.

The trial court ordered defendant to provide a DNA sample before he was sentenced, and when defendant initially refused to comply with the order, the court authorized the Sheriff's Department to use reasonable force to obtain the sample. Defendant then furnished a DNA sample. The court sentenced defendant to a prison term of 16 months on the arson charge, imposed concurrent sentences on the charges of possession of combustible material and misdemeanor refusal to provide a DNA specimen, and stayed the sentence on the vandalism charge under Penal Code section 654.

On appeal, the Court of Appeal reversed defendant's conviction for refusing to provide a DNA sample. The court held that "the DNA Act, to the extent it requires felony arrestees to submit a DNA sample for law enforcement

7

analysis and inclusion in the state and federal DNA databases, without independent suspicion, a warrant or even a judicial or grand jury determination of probable cause, unreasonably intrudes on such arrestees' expectation of privacy and is invalid under the Fourth Amendment of the United States Constitution."

We granted review. While the case was still pending, the United States Supreme Court issued its decision in *King*, *supra*, which upheld a similar DNA collection requirement against Fourth Amendment challenge. Following *King*, we transferred this case to the Court of Appeal for reconsideration.

The Court of Appeal again reversed defendant's conviction. Although the court observed that California's DNA collection law is broader than the Maryland law at issue in *King*, the court declined to decide whether the differences between the California law and the Maryland law change the Fourth Amendment calculus under *King*. The Court of Appeal instead rested its decision on the prohibition on unreasonable searches and seizures in article I, section 13 of the California Constitution. In language closely paralleling its initial decision, the court held that "the DNA Act, to the extent it requires felony arrestees to submit a DNA sample for law enforcement analysis and inclusion in the state and federal DNA databases, without independent suspicion, a warrant or even a judicial or grand jury determination of probable cause, unreasonably intrudes on such arrestees' expectation of privacy and is invalid under article I, section 13, of the Constitution."

In the wake of *King*, other California Courts of Appeal have addressed the constitutionality of the DNA Act in the context of reviewing decisions regarding the suppression of evidence derived from DNA samples collected from felony arrestees. Those courts have concluded that, under *King*'s reasoning, the collection and testing of arrestee DNA samples under the DNA Act does not violate the Fourth Amendment.

We granted review to decide whether the collection and analysis of forensic identification DNA database samples from felony arrestees, as required by Proposition 69, violates either article I, section 13 of the California Constitution or the Fourth Amendment to the United States Constitution.[1]

## II.

The Fourth Amendment to the United States Constitution provides, in pertinent part:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  Article I, section 13 of the California Constitution provides, in essentially identical language:  "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated."

As the constitutional language itself makes plain, the "touchstone for all issues" under both provisions is "reasonableness."  (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1329; accord, e.g., *Riley v. California* (2014) 573 U.S. ___, ___ [134 S.Ct. 2473, 2482].)  The question before us is whether it was unreasonable within the meaning of one or both of these provisions to require defendant to use a cheek swab to provide a DNA sample to jail officials as part of the booking process following his arrest for arson.  If so, defendant cannot be penalized for failure to comply, and his misdemeanor refusal conviction must be reversed.  If, on the other hand, the requirement was reasonable, then defendant's conviction stands.  (See

---

[1]    Defendant did not invoke the California Constitution in the trial court or in his first round of appellate briefing, instead relying solely on the Fourth Amendment.  The Court of Appeal, however, relied on the California Constitution in its decision on remand after *King*.  We accordingly address the questions raised under both the Fourth Amendment and article I, section 13 of the California Constitution.

9

*Birchfield v. North Dakota* (2016) 579 U.S. ___, ___–___ [136 S.Ct. 2160, 2172–2173].)

The United States Supreme Court's decision in *King*, which was issued while this appeal was pending, has significantly altered the terms of the debate. After *King*, defendant no longer argues, as he had argued in the courts below, that the Fourth Amendment categorically forbids the mandatory collection of DNA from persons who have been arrested but not yet convicted of felony offenses. Defendant argues instead that *King* should be either distinguished on its facts or rejected as a matter of state constitutional law. Because both arguments require us to consider the import of the United States Supreme Court's decision in *King*, we will begin there.

**A.**

*King* came to the high court against the backdrop of increasingly widespread use of DNA technology in criminal justice systems nationwide. As the court observed, all 50 states and the federal government require the collection of DNA samples from individuals who are convicted of felony offenses. In recent years, a majority of states and the federal government have also authorized the collection of DNA from some or all persons arrested for felony offenses. (*King*, *supra*, 569 U.S. at p. 445.) Although courts had generally approved the collection of DNA samples following conviction, the permissibility of this expansion of DNA sampling proved more controversial. The high court granted review in *King* to resolve a conflict among federal and state courts "as to whether the Fourth Amendment prohibits the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on felony charges." (*Id*. at p. 442.)

The specific question before the court concerned the application of a Maryland law that authorized law enforcement authorities to collect DNA samples from an individual charged with certain statutorily defined "crime[s] of violence,"

including murder, rape, first degree assault, kidnapping, arson, and sexual assault, as well as burglary and an attempt to commit one of these enumerated crimes. (*King*, *supra*, 569 U.S. at p. 443.) The defendant in *King* had been arrested and charged with one such offense, "first- and second-degree assault for menacing a group of people with a shotgun." (*Id.* at p. 440.) The same day, his cheek was swabbed for DNA as part of the booking process. The sample matched DNA that had been collected from a rape victim several years earlier, and the defendant was charged with and convicted of the rape. Appealing that conviction, defendant argued that the DNA sample had been taken in violation of his Fourth Amendment rights and should have been suppressed. The Maryland Court of Appeals agreed and overturned the rape conviction. (*Ibid.*)

The United States Supreme Court reversed. The high court agreed with the Maryland court that a buccal swab for the collection of DNA samples—like any invasion of the body—is a search within the meaning of the Fourth Amendment, "gentle" though the search may be. (*King*, *supra*, 569 U.S. at p. 446.) But the court held that both the initial collection of a DNA sample and its subsequent processing pursuant to CODIS procedures is, "like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*Id.* at p. 466.)

The high court explained that, as a general rule, a search is presumptively unreasonable if it is undertaken in the absence of a warrant or individualized suspicion of wrongdoing. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652–653.) But "[i]n some circumstances, such as '[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " (*King*, *supra*, 569 U.S. at p. 447, quoting *Illinois v. McArthur* (2001) 531 U.S. 326, 330.) The court

11

concluded that the buccal swab of an arrestee on booking falls into a category of routine searches, justified by special law enforcement needs, that is properly analyzed "by reference to the proposition that the 'touchstone of the Fourth Amendment is reasonableness, not individualized suspicion.' " (*King*, at p. 448.)

Weighing the privacy-related concerns at stake against law enforcement needs, the court concluded that the search was reasonable. On the law enforcement side of the balance, the court identified five interrelated governmental interests in obtaining the DNA sample. First, the court explained, the state has an interest in knowing " 'who has been arrested and who is being tried.' " (*King*, *supra*, 469 U.S. at p. 450, quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County* (2004) 542 U.S. 177, 191.) "A suspect's criminal history," the high court continued, "is a critical part of his identity that officers should know when processing him for detention," and "[a] DNA profile is useful to the police because it gives them a form of identification to search the records already in their valid possession" for the suspect's criminal history. (*King*, at pp. 450–451.) In this respect, the court said, the profile serves the same purpose as a name or fingerprints. (*Id*. at p. 451.) Second, the high court reasoned, "DNA identification can provide untainted information to those charged with detaining suspects and detaining the property of any felon," which is significant because "officers must know the type of person whom they are detaining, and DNA allows them to make critical choices about how to proceed." (*Id.* at p. 452.) Third, the court noted, using DNA samples to determine whether the accused has committed other crimes furthers the state's " 'substantial interest in ensuring that persons accused of crimes are available for trials.' " (*Ibid*.) This is so, it said, because "[a] person who is arrested for one offense but knows that he has yet to answer for some past crime may be more inclined to flee the instant charges," thereby presenting "a risk to law enforcement officers, other detainees, victims of previous crimes,

12

witnesses, and society at large." (*Id.* at p. 453.) Fourth, the court explained, "an arrestee's past conduct is essential to an assessment of the danger he poses to the public," which may determine "whether the individual should be released on bail." (*Ibid.*) And fifth, the court noted, "the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense." (*Id.* at p. 455.)

Law enforcement agencies, the court explained, "routinely have used scientific advancements in their standard procedures for the identification of arrestees" (*King*, *supra*, 569 U.S. at p. 456), including photographs, body measurements, and fingerprints. The court observed that fingerprinting, in particular, is "[p]erhaps the most direct historical analogue to the DNA technology" at issue in the case (*id.* at p. 458): fingerprints have long been taken for purposes of comparison to identify suspects and for purposes of matching them to fingerprints taken from the scene of unsolved crimes, and electronic databases are now available that facilitate the comparison (*id.* at pp. 436, 458–459). DNA identification, the court noted, is a "markedly more accurate form of identifying arrestees" and the "additional intrusion upon the arrestee's privacy beyond that associated with fingerprinting is not significant." (*Id.* at p. 459.) "DNA identification," the court reasoned, "is an advanced technique superior to fingerprinting in many ways, so much so that to insist on fingerprints as the norm would make little sense to either the forensic expert or a layperson." (*Ibid.*)

Compared to this set of governmental interests, the high court concluded that the privacy interests at stake were more limited. To begin with, the court explained, the buccal swab used to obtain a DNA sample is a "minimal intrusion." (*King*, *supra*, 569 U.S. at p. 463.) Moreover, the court noted, "[o]nce an individual has been arrested on probable cause for a dangerous offense that may require detention before trial," that person has a diminished expectation of privacy

13

and "freedom from police scrutiny." (*Ibid*.) This diminished expectation distinguishes arrestee searches from "the sort of programmatic searches of either the public at large or a particular class of regulated but otherwise law-abiding citizens" (*id.* at p. 462), such as checkpoint searches or the drug testing of political candidates, for which the court has "insisted on some purpose other than 'to detect evidence of ordinary criminal wrongdoing.' " (*Id.* at p. 463.)

The high court further concluded that analysis of the DNA sample, once collected, does not result in a privacy intrusion that violates the federal Constitution. (*King*, *supra*, 569 U.S. at p. 464.) It explained that the processed DNA loci "come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee" and that "law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which future samples may be matched." (*Ibid.*) It also noted that Maryland's DNA law "provides statutory protections that guard against further invasion of privacy" (*id.* at p. 465.); in the court's view, these statutory protections allayed the privacy concerns associated with the state's analysis of the DNA sample (*ibid.*, citing *NASA v. Nelson* (2011) 562 U.S.___, ___ [131 S.Ct. 746, 750]).

For these reasons, the court held that "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*King*, *supra*, 569 U.S. at pp. 465–466.)

**B.**

At least at first glance, *King* would seem to resolve the Fourth Amendment question raised in this case. *King* holds that DNA identification of arrestees is reasonable on booking following an arrest supported by probable cause to believe

14

the arrestee has committed a serious offense. Defendant in this case was asked to provide a cheek swab as part of a routine booking procedure following an arrest supported by probable cause to believe he had committed a serious offense—namely, felony arson.

Defendant urges us to take a second look, however. He notes that while California's legal framework for the collection, analysis, and retention of arrestee DNA is in many ways similar to the Maryland law upheld in *King*, it is not identical. Defendant highlights three features of the DNA Act in particular that, in his view, distinguish this case from *King*: (1) the DNA Act applies to a broader category of arrestees than the Maryland law; (2) the DNA Act, unlike the Maryland law, authorizes both collection and testing of DNA samples before an accusatory pleading is filed in court and before a judicial determination has been made that the charges are valid; and (3) the DNA Act, unlike the Maryland law, does not provide for automatic destruction of the DNA sample if the arrestee is cleared of felony charges.

Although these differences between the California and Maryland laws may be relevant in another case involving a differently situated arrestee, this case involves a defendant who was validly arrested on probable cause to believe he had committed felony arson, and who was promptly charged with (and ultimately convicted of) that offense. In the context of the particular case before us, we conclude that none of the differences to which defendant points meaningfully alters the constitutional balance struck in *King*.

We begin with defendant's first argument, about the scope of the DNA Act's collection requirement. Defendant observes that the Maryland law at issue in *King* authorized DNA collection only from those accused of specified serious crimes, including a category defined as "crime[s] of violence" under state law, whereas the DNA Act authorizes DNA collection from all felony arrestees. (*King*,

15

*supra*, 569 U.S. at p. 443.)  Defendant argues that this difference is important because the seriousness of the crime of arrest figures prominently in the high court's balancing analysis:  The high court's opinion states that "the necessary predicate of a valid arrest for a serious offense is fundamental" (*id.* at p. 461), and elsewhere uses language that suggests the court was particularly concerned with persons arrested for "violent" or "dangerous" crimes (*id.* at pp. 453, 455).  Such a limitation makes sense, defendant contends, because such crimes are the kinds of crimes that typically yield DNA evidence.

Defendant appears to read too much into the language on which he relies. The high court identified the question before it more generally as "whether the Fourth Amendment prohibits the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on felony charges." (*King*, *supra*, 569 U.S. at p. 442.)  And as a matter of ordinary usage, a felony is considered a "serious" offense.  (See, e.g., *Carachuri-Rosendo v. Holder* (2010) 560 U.S. 563, 574 ["A 'felony,' we have come to understand, is a 'serious crime usu[ally] punishable by imprisonment for more than one year or by death.' "].)  Though the court also occasionally referred to "violent" and "dangerous" crimes, *King* did not purport to limit its holding to those felonies that happen to be classified as "violent" or "dangerous" as a matter of state law, nor did it purport to create a new classification of violent offenses as a matter of federal constitutional law.[2]

---

[2]      States are, of course, under no obligation to classify any particular set of crimes as "violent," and different states often classify similar crimes differently. Such "interstate statutory differences do not control the meaning of the Fourth Amendment." (*Robinson*, *supra*, 47 Cal.4th at p. 1123; cf. *Virginia v. Moore* (2008) 553 U.S. 164, 176.)  Nor does there exist a body of federal constitutional law that might supply a relevant classification.  (Cf., e.g., *Atwater v. City of Lago Vista* (2001) 532 U.S. 318, 345 [declining to adopt a classification of "violent" misdemeanors for Fourth Amendment purposes].)

But in any event, even if the federal Constitution permitted states to mandate collection of DNA samples only from persons arrested for felonies classified as particularly serious or violent, defendant in this case was arrested for felony arson in violation of Penal Code section 451, subdivision (d), a crime that is classified as a "serious felony" under California law. (See Pen. Code, § 1192.7, subd. (c)(14).) Defendant does not dispute the characterization.

Defendant's argument would thus seem to amount to a request that we reverse his conviction based not on any defect in the DNA Act's application to his case, but based on the Act's potential application to other, differently situated individuals. This is more than he may reasonably ask. The ordinary rule is "that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself." (*In re Cregler* (1961) 56 Cal.2d 308, 313 (*Cregler*).) This rule does have limited exceptions—most commonly invoked in free speech cases—but none is relevant here. (*Sabri v. United States* (2004) 541 U.S. 600, 609–610 (*Sabri*); see, e.g., *United States v. Mitchell* (3d Cir. 2011) 652 F.3d 387, 415, fn. 26 (en banc) (*Mitchell*) [felony arrestee could not raise a successful facial challenge to federal DNA collection law on the ground that it applies to misdemeanor arrestees and is therefore overbroad]; cf. *Rakas v. Illinois* (1978) 439 U.S. 128, 133–134 [" 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' "].) Outside of these limited exceptions, and "absent a good reason, we do not extend an invitation to bring overbreadth claims." (*Sabri*, at p. 610.) No such reason appears in this case.

Defendant next points out that the Maryland law upheld in *King* permitted collection of a DNA sample only of arrestees "charged" with qualifying crimes (Md. Code Ann., Pub. Saf., § 2-504(b)(1)), and prohibited officials from testing the sample or loading the profile into the statewide database until after the arrestee

17

was arraigned and a judicial officer determined that the arrest was based on probable cause (*id.*, § 2-504(d)(1)). The DNA Act, by contrast, allows collection "immediately following arrest" and provides that the samples shall "immediately" be forwarded to the laboratory for analysis. (Pen. Code, § 295(i)(1)(C).) Defendant argues that these differences in the time prescribed for the collection and testing of DNA samples tip the balance against their constitutionality.

There are two elements to this argument: one concerning the timing of the collection, the other concerning the timing of analysis. As to the timing of collection, there is no reason to believe that the differences between California's law and Maryland's change the Fourth Amendment balance applicable in this case. Although the text of the DNA Act does purport to authorize the collection "immediately following arrest," that provision was not invoked and is not at issue here. Rather, jail officials in this case sought to collect a sample of defendant's DNA on booking, as part of the routine collection of identifying information. And *King*, once again, upheld DNA collection as a "legitimate police *booking* procedure," like fingerprinting or photographing, that enables jail officials to know whom they have taken into custody. (*King*, *supra*, 569 U.S. at p. 466, italics added.) *King* itself involved a sample collected on booking. (*Id.* at p. 441; see *King v. State* (Md. 2012) 42 A.3d 549, 557.)[3] And there are practical reasons for

---

[3] In his brief, defendant read the Maryland law's reference to arrestees "charged" with certain offenses as prohibiting the collection of DNA until a prosecutor decides whether to file qualifying charges following arrest. (See Md. Code. Ann., Pub. Saf., § 2-504(b)(1).) But the Attorney General notes that in Maryland, charges are often filed by the police officer, rather than the prosecutor. (Md. Rules, rule 4-211(b)(2).) The high court's opinion in *King* did not address the meaning or significance of this provision of the Maryland law; its analysis was focused not on the nature of the charging decision, but on the fact of an arrest supported by probable cause.

collecting the required DNA sample at the time of booking, along with taking photographs and fingerprints. Among other things, if the arrestee is released pending adjudication, officials may not have another opportunity. (See *Mario W. v. Kaipio* (Ariz. 2012) 281 P.3d 476, 482 ["If . . . a juvenile is released pending adjudication and later fails to appear for trial without previously having submitted a buccal sample, the opportunity to obtain a DNA profile for identification purposes will have been lost. The State has an important interest in locating an absconding juvenile and, perhaps years after charges were filed, ascertaining that the person located is the one previously charged."].)

As to the second point, defendant argues that it is unreasonable for officials to proceed to test the DNA sample once collected, and to upload an arrestee's profile to the state DNA databank, before a judicial officer has found probable cause to support the arrest or before charges have been filed. Defendant argues that it is this step—the testing and recording of the arrestee's DNA identification profile—that "represents the far greater intrusion upon privacy." And a provision like Maryland's ensures that this step is not taken before there is third party confirmation that the defendant was validly arrested and that he or she will face legal process for a felony offense.

Defendant, who has never contested that his arrest was based on probable cause,[4] made no similar argument in the trial court; he argued that it was impermissible to require him to submit a DNA sample at all, not that it was unreasonable to do so without a guarantee that the analysis of the sample would be delayed until probable cause was confirmed by a neutral magistrate or charges were filed. We observe, however, that the reasoning of *King* itself does not lend substantial support to the argument that such a guarantee is required under these circumstances. Again, *King* approved "DNA identification"—which necessarily involves both taking and analyzing the sample—as a "legitimate police booking procedure" that enables law enforcement to know whom they have in custody. (*King*, *supra*, 569 U.S. at pp. 465–466.) That interest is one that attaches as soon as the suspect is "formally processed into police custody." (*Id.* at pp. 449–450.) The court attached no significance to the timing provision of the Maryland statute on which defendant relies. The point was, rather, raised primarily in the dissenting opinion, which argued that delaying DNA testing until arraignment *undermined* the argument that the requirement qualifies as a reasonable booking procedure. (*Id.* at pp. 471–472 (dis. opn. of Scalia, J.).)

Defendant contends that the timing of analysis nevertheless ought to figure in the equation because, as a practical matter, officers ordinarily will not receive a

---

**4** On the contrary, it appears that defendant acknowledged from the outset that there was probable cause to arrest him. While being placed in a patrol car at the scene, defendant spontaneously stated, "I didn't think it would work" and noted that the officer who initially observed him in the act had "[p]erfect timing, him coming up the hill like that." According to his own testimony at trial, moreover, he anticipated he would be charged for his acts. Justified as his protest was, he testified, he knew "how the legal system works" and that "[t]hey [we]re going to regard this as an illegal act."

suspect's DNA profile until well after booking in any event. When officers make a warrantless arrest and take a suspect into custody, due process ordinarily requires that a judicial officer make a probable cause determination promptly after booking—ordinarily within 48 hours—to justify continued pretrial detention. (*County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 58–59.) (No such requirement applies if the arrestee is released from detention. (*In re Walters* (1975) 15 Cal.3d 738, 743; see also Pen. Code, § 849, subd. (a).)) By contrast, defendant notes, in California it has typically taken much longer—at the time of briefing, an average of 30 days—to generate an identification profile from an arrestee's DNA sample. (See *King*, *supra*, 569 U.S. at p. 454 [citing the same statistic].) Defendant argues that in view of the delays already associated with sample processing, it would pose a negligible burden for officials to postpone processing until a judge has determined whether probable cause exists and a prosecutor has decided whether to file charges.

Defendant's point about average processing times is not one that escaped the high court's notice in *King*; as noted, the court itself cited the same numbers. The court nevertheless concluded that DNA identification is a reasonable booking procedure, without suggesting that its reasonableness might vary depending on average processing times. The reasons for this are not difficult to discern. For one thing, individual DNA samples may be processed more quickly than average: The court noted the states' submission that some DNA identification samples in California have been processed significantly more quickly than others. (*King*, *supra*, 569 U.S. at p. 454.) Moreover, as is often the case in areas of fast-moving technological developments, average processing times are liable to change; the high court had been told that the technological capacity already exists to analyze DNA samples in a matter of minutes, rather than days or weeks, and that technology is likely to become more widespread in the near future. (*Id.* at p. 460;

21

see Rapid DNA Act of 2017, Pub.L. No. 115-50 (Aug. 18, 2017) 131 Stat. 1001; see also 42 U.S.C. §§ 14131(a), 14135a.)  The court "[took] account of these technical advances" (*King*, at p. 460) in evaluating the reasonableness of DNA collection and testing as a means of "prompt identification" (*id*. at p. 459).  Given all this, we cannot proceed on the assumption that a rule delaying the collection or processing of samples until after a judicial probable cause finding or arraignment would pose no meaningful risk of interference with the central interest identified in *King*:  the accurate identification of arrestees who are taken into police custody.

Defendant argues, not unreasonably, that we should decide this case in light of the conditions that prevailed at the time he refused to provide the sample, not in light of technological advances that might make it possible to process DNA samples more quickly in the future.  But considering the matter from this vantage point does not help defendant's case.  If we assume that defendant's sample would not have been processed significantly faster than the average of 30 days, as defendant would have us do, then we would also be bound to conclude that defendant would have, de facto, received the very delay he seeks:  The record indicates that a judge found probable cause to support defendant's felony arrest a little more than 24 hours after he was arrested, and he was arraigned within 48 hours, as the law requires.  In a world of 30-day processing times, defendant's sample would not have been processed, or his DNA profile uploaded to the state DNA databank, before these events occurred.

Although defendant himself was charged and convicted, we acknowledge defendant's concern about the collection of DNA samples from other individuals who are booked into custody but who ultimately will never be charged with a qualifying crime, or against whom qualifying charges will ultimately be dismissed.  Voters responded to that concern by providing for a particular remedy— expungement of the DNA sample and associated records—when the suspect is

22

cleared of qualifying charges. As *King* illustrates, voters could also have chosen to require that all sample processing be postponed until after arraignment, regardless of technological capacity to proceed more quickly. But given the basic logic of *King*, we cannot say that the choice voters made is one that undermines the reasonableness of the search in this case.

Justice Liu suggests that for purposes of deciding reasonableness of an arrestee's search, an arrest should not be considered valid until there has been a judicial determination of its validity. (Dis. opn. of Liu, J., *post*, at pp. 1–2.) There is, however, a meaningful difference between the requirement of a valid arrest and a requirement that a neutral magistrate make such a determination. For example, in the related context of searches incident to arrest—where a valid arrest is also essential—there is no such preapproval requirement. (See *United States v. Robinson* (1973) 414 U.S. 218, 219–224 [approving search of the person at time of valid arrest made without warrant]; *People v. Brisendine* (1975) 13 Cal.3d 528, 532–534 (*Brisendine*) [approving search for weapons upon a warrantless arrest, under circumstances requiring prolonged proximity to arrestees].) The arrestee may have an exclusionary remedy if the arrest is later determined to have been illegal (see 6 LaFave, Search and Seizure (5th ed. 2012) § 11.4(d), pp. 407–408), but the search's reasonableness does not depend on prior judicial authorization for the arrest. Here, there is no dispute that the arrest was valid. To the extent the dissenting opinions argue for a prophylactic rule delaying the analysis of an arrestee's DNA sample until probable cause for the arrest has been judicially determined, we again note that defendant raised no such argument in the trial court and we decline to decide the constitutional necessity of such a rule in a case in which probable cause has never been contested.

This brings us to defendant's final point, concerning the adequacy of the DNA Act's expungement procedures. As defendant notes, under the Maryland

law at issue in *King*, an arrestee who is later exonerated is entitled to automatic destruction of his or her DNA sample and associated records. (*King*, *supra*, 569 U.S. at pp. 443–444.) Under the DNA Act, by contrast, an exonerated arrestee ordinarily must file a written request for expungement of DNA records. (Pen. Code, § 299, subds. (a) & (b).)[5] Provisions of the Act can be read to suggest, moreover, that a trial court may not act on such a request before 180 days have elapsed, and the court has unreviewable discretion to grant or deny the request. (*Id.*, subd. (c)(1) & (c)(2)(D).) Defendant argues that these provisions, by contrast to Maryland's automatic destruction provisions, mean that a DNA profile can be generated and maintained in the state database even after a suspect's arrest has been found to be mistaken or unlawful. What is more, he argues, the provisions make it possible for the state to retain the DNA sample and associated records for an extended period of time—perhaps even indefinitely—after the prosecutor has declined to file or has dismissed charges, or after those charges have failed to yield a conviction. In sum, defendant argues, the DNA Act's expungement provisions are insufficient to protect the privacy rights of felony arrestees who are later found to have been wrongly arrested or who are cleared of wrongdoing.

*King* does not speak directly to the issue defendant raises concerning the adequacy of the DNA Act's expungement procedures. Although the high court mentioned Maryland's automatic destruction provisions in passing, it attached no significance to them in its constitutional analysis. (*King*, *supra*, 569 U.S. at pp. 443–444.) Rather, the court responded to privacy concerns about the state's

---

**5**    A different provision of the DNA Act requires the Department of Justice DNA Laboratory to "remove [a] suspect sample from its databank files and databases" after two years upon confirmation that the "person is no longer a suspect in a criminal investigation." (Pen. Code, § 297, subd. (c)(2).) The parties have not addressed the relevance of this provision, if any.

processing of DNA samples by emphasizing features of the Maryland law that are shared by California's: namely, the analysis of a sample involves the processing only of loci from "noncoding parts of the DNA that do not reveal the genetic traits of the arrestee," and the law strictly prohibits the misuse of DNA records for any purpose other than identification. (*Id.* at p. 464; see *id.* at p. 465; Pen. Code, § 299.5.)

The court's failure to mention the expungement provisions does not necessarily mean that they are irrelevant to the constitutional analysis, however. To be sure, the retention of an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally has not been thought to raise constitutional concerns, even though the arrestee may later be exonerated. (*Loder v. Municipal Court* (1976) 17 Cal.3d 859, 864–869; *People v. McInnis* (1972) 6 Cal.3d 821, 826.) But the question defendant raises is whether, given the uniquely sensitive nature of DNA information, a different rule should apply here: one that calls not only for expungement, but for automatic expungement of an arrestee's DNA sample, DNA identification profile, or both after an arrest has been shown to be invalid or after an arrestee is cleared of charges, or both.

Whether the Fourth Amendment requires this added protection for the wrongly arrested or exonerated is, however, a question we must leave for another day, because defendant in this case is neither. Defendant has not been found to have been wrongly arrested; indeed, he has never challenged the validity of his arrest. Nor was he cleared of the charges that formed the basis for his arrest; he was promptly charged with that offense and was later convicted as charged. Although our dissenting colleagues argue otherwise (dis. opn. of Liu, J., *post*, at pp. 7–8; dis. opn of Cuéllar, J., *post*, at pp. 25–26), we are aware of no support for the proposition that an arrestee who, like defendant, has never claimed to be entitled to expungement, is nevertheless entitled to challenge the adequacy of

25

expungement procedures. (See *Mitchell*, *supra*, 652 F.3d at p. 412 [arrestee who had never provided a sample and who had never sought expungement was "not in a position" to challenge the adequacy of the expungement provisions of the federal DNA collection statute].)

Again, the ordinary rule is "that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself." (*Cregler*, *supra*, 56 Cal.2d at p. 313.) Further, "a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations." (*Ibid.*) By focusing on the facts presented by the case before us, we avoid premature judgment of constitutional questions, including " 'premature interpretatio[n] of statutes' on the basis of factually bare-bones records." (*Sabri*, *supra*, 541 U.S. at p. 609, quoting *United States v. Raines* (1960) 362 U.S. 17, 22.)

Restraint is particularly warranted here because much of defendant's argument depends on assertions about the workings of the expungement procedures that are as yet untested and unproved. The record before us reveals nothing, for example, about how the expungement provisions operate in a case in which a judge finds no probable cause to support the arrest. The statute does make clear that a person who is found to have been wrongly arrested is entitled to expungement: it says that "a person who has no past or present qualifying offense" may make a request for expungement if, among other things, no qualifying charges have been filed "within the applicable period allowed by law" or if qualifying charges "have been dismissed prior to adjudication by a trier of fact." (Pen. Code, § 299, subd. (b)(1).) But the requirement that the arrestee make a written request with supporting documentation from the court or the district attorney, for example, appears to be aimed at dispelling any doubt as to whether qualifying charges may still be filed against the arrestee. (*Id.*, § 299, subd.

26

(c)(2)(B).)  It is unclear whether or how this requirement would apply in a case in which a judge has ruled from the outset that the defendant's felony arrest was unsupported by probable cause.

Much the same is true about defendant's concern that the state may indefinitely retain DNA information of a person who, though arrested, has been found innocent of any crime.  Defendant contends that a prosecutor may unilaterally block expungement by objecting for any reason, and a trial court likewise may deny expungement in its unconstrained discretion.  It is not clear that he is correct on either score.  It is true that the DNA Act describes a process that permits prosecutors to file objections to expungement (Pen. Code, § 299, subd. (c)(2)(D)), and speaks of trial court "discretion" to grant or deny an expungement request (*id.*, § 299, subd. (c)(1)).  But the DNA Act also provides that if there is no other legal basis for retaining the information, an exonerated arrestee "*shall* have his or her DNA specimen and sample destroyed and searchable database profile expunged from the databank program."  (Pen. Code, § 299, subd. (a), italics added.)  Federal law likewise provides that a state participating in CODIS "shall promptly expunge" from that database the DNA profile of any person who is later cleared of qualifying charges.  (34 U.S.C. § 12592(d)(2)(A).)  And to the extent there is any question about the proper interpretation of the statute, it might well be resolved by reference to the usual rule that a statute will be interpreted to avoid serious constitutional questions if such an interpretation is fairly possible.  (See, e.g., *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373.)  Whether legislation may deprive the appellate courts of all modes of reviewing a trial court's order, as section 299, subdivision (c)(1) might appear to do, poses such a question.  (See Cal. Const., art VI, §§ 10, 11 [jurisdiction of appellate courts over appeals and writs]; *Leone v. Medical Board* (2000) 22 Cal.4th 660, 668 [Legislature may not

restrict appellate review in a manner that would substantially impair courts' constitutional powers].)

Nor does a trial court order appear to be a necessary prerequisite to expungement. As the Attorney General points out, the California Department of Justice has created a "streamlined" process whereby eligible individuals may seek expungement directly from the Department, using a publicly available two-page form.[6] Defendant does not question the Department's authority to create this alternative, "streamlined" expungement process. (See Pen. Code, § 295, subd. (h)(1) [authorizing the Department to adopt policies and enact regulations for the implementation of the DNA Act].) And although he notes that a trial court might have to get involved if the Department denies a valid expungement request, he points to no case in which such a thing has occurred.

Because defendant never sought expungement—and indeed, has never claimed to be entitled to seek expungement, since he was both charged with and ultimately convicted of a qualifying crime—we have no occasion here to resolve any questions that might arise about the implementation of the expungement provisions in other cases. It suffices to note that many of defendant's assertions about the operation of the expungement process are, at this point, necessarily speculative. This court ordinarily does not issue constitutional rulings based on speculation, and we will not do so here. (See, e.g., *Cregler*, *supra*, 56 Cal.2d at

---

[6] California DOJ, Streamlined DNA Expungement Application Form, <http://ag.ca.gov/bfs/pdf/expungement_app.pdf > [as of Apr. 2, 2018]. As the Attorney General notes, the Frequently Asked Questions page on the DOJ website indicates that the expedited expungement process is generally completed within two to four weeks. (See <https://oag.ca.gov/bfs/prop69/faqs#retention> [as of Apr. 2, 2018].)

p. 313; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 172.)[7]

In short, although the DNA Act differs in some ways from the Maryland law at issue in *King*, none of those differences affects the Fourth Amendment analysis in the specific case before us. *King* holds that a cheek swab is a reasonable booking procedure for individuals who are arrested for serious offenses, and defendant was asked to provide a cheek swab upon being booked after a valid arrest for a serious offense. Defendant's conviction for failing to submit a sample of his DNA therefore did not violate the Fourth Amendment to the federal Constitution.

---

[7]     As Justice Cuéllar notes in his dissent (*post*, pp. 29–30), after we granted review in this case, the Legislature enacted versions of Penal Code sections 298 and 299 to become operative were this court to affirm the Court of Appeal's decision below. These include provisions for more automatic expungement and for delay in analyzing samples until probable cause for the arrest has been judicially determined. (Stats. 2015, ch. 487, §§ 3, 5.)

It goes without saying that our job is not to decide which version of the statute we prefer, but instead to determine whether the DNA Act, as enacted by California voters, is constitutional as applied to defendant in the case before us. The legislative amendments themselves make this clear. The Legislature did not attempt to substitute these statutory provisions for those the voters approved; whether it could do so, consistent with its role under Proposition 69, is therefore a question not presented here. (See Prop. 69, *supra*, § V, subd. (c) [amendments may be made only "to enhance the use of DNA identification evidence for the purpose of accurate and expeditious crime-solving and exonerating the innocent"].) The Legislature instead enacted the provisions as a kind of fallback measure, providing that the amendments would come into force only if we affirm the lower court's ruling as to the statutory sections' unconstitutionality as applied in this case (presumably on a basis that would not equally undermine the validity of the Legislature's conditional amendments). We accordingly focus solely on the law as the voters enacted it, as applied to the facts of the case before us.

29

## III.

Defendant argues, and the Court of Appeal concluded on remand from *King*, that even if requiring him to furnish a DNA sample as part of the booking process did not violate the Fourth Amendment, it violated the parallel prohibition on unreasonable searches and seizures in article I, section 13 of the California Constitution.

We evaluate the constitutionality of searches and seizures under our state Constitution by employing the same mode of analysis that the high court applied in *King*, *supra*, 569 U.S 435. That is, we determine whether the intrusion on the defendant's expectation of privacy is unreasonable by applying "a general balancing test 'weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty.' " (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 29–30, quoting *Ingersoll v. Palmer*, *supra*, 43 Cal.3d at p. 1338.) Defendant does not argue otherwise. He instead argues that we should reject *King*'s balancing of these interests as a matter of state constitutional law.

In addressing defendant's argument, we reaffirm several long-established principles. First, the California Constitution is, and has always been, "a document of independent force" (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 325) that sets forth rights that are in no way "dependent on those guaranteed by the United States Constitution" (Cal. Const., art. I, § 24). "As an historical matter, article I and its Declaration of Rights was viewed as the only available protection for our citizens charged with crimes, because the federal Constitution and its Bill of Rights was initially deemed to apply only to the conduct of the federal government." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352–353.) While the setting changed following ratification of the Fourteenth

30

Amendment to the United States Constitution and the selective incorporation of the Bill of Rights, it remains a basic tenet of our system of federalism that "the nation as a whole is composed of distinct geographical and political entities bound together by a fundamental federal law but nonetheless independently responsible for safeguarding the rights of their citizens." (*Brisendine*, *supra*, 13 Cal.3d at p. 550.)

Second, although decisions of the United States Supreme Court interpreting parallel federal text are not binding, we have said they are "entitled to respectful consideration." (*People v. Teresinski* (1982) 30 Cal.3d 822, 836 (*Teresinski*); cf., e.g., *Gabrielli v. Knickerbocker* (1938) 12 Cal.2d 85, 89 ["[C]ogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution."].) This approach reflects the "respect due to the decision of that high tribunal, the fact that to it has been committed, by the consent of the states, the ultimate vindication of liberty and property against arbitrary and unconstitutional state legislation." (*People v. Budd* (1889) 117 N.Y. 1, 13, affd. *Budd v. New York* (1892) 143 U.S. 517, cited in *Gabrielli*, *supra*, 12 Cal.2d at p. 89.)

We have had several occasions to address the application of these principles in the context of search and seizure law in particular. Today, following a 1982 state constitutional amendment passed by voter initiative, the United States Supreme Court's interpretation of the Fourth Amendment is often not only persuasive, but controlling in criminal cases: Under Proposition 8, the "Right to Truth-in-Evidence" (Cal. Const., art. I, § 28, subd. (f)(2)), added by voters in 1982, the exclusionary rule does not apply to a search or seizure that violates article I, section 13, but does not violate the Fourth Amendment, and the fruits of such a search or seizure are admissible in a criminal trial. This means that in

31

California criminal proceedings, issues related to the suppression of evidence seized by police are, in effect, governed by federal constitutional standards. (*E.g.*, *People v. Lenart* (2004) 32 Cal.4th 1107, 1118; see *In re Lance W.* (1985) 37 Cal.3d 873, 891 [upholding Proposition 8].) But when voters later enacted an initiative measure that would have eliminated this court's ability to independently construe the California Constitution's provisions granting certain rights to criminal defendants, including the right to be free of unreasonable searches and seizures, we explained that such far-reaching change could be accomplished only by constitutional revision: While our law has long reflected a "*general* principle or policy of deference to United States Supreme Court decisions," the initiative measure could not "*mandate* the state courts' blind obedience thereto, despite 'cogent reasons,' 'independent state interests,' or 'strong countervailing circumstances' that might lead our courts to construe similar state constitutional language differently from the federal approach." (*Raven v. Deukmejian*, *supra*, 52 Cal.3d at p. 353.)[8]

Even before the passage of Proposition 8, this court ordinarily resolved questions about the legality of searches and seizures by construing the Fourth Amendment and article I, section 13 in tandem. (E.g., *People v. Triggs* (1973) 8

---

[8] Our colleagues in dissent would go further; they argue that we should take no special account of the federal high court's interpretation of language common to the United States and California Constitutions. (See dis. opn. of Liu, J., *post*, pp. 11–12; dis. opn. of Cuéllar, J., *post*, pp. 4–5.) But as *Raven v. Deukmejian* made clear in rejecting an effort to eliminate our independent interpretive authority altogether, the approach we have described is neither a relic of a long-distant past nor a recent innovation. We will accordingly follow this court's long-standing policy and practice of giving meaningful and careful consideration to federal high court decisions construing parallel constitutional text, without in any way denying or denigrating our power and duty to depart from those decisions when sufficient reasons appear.

Cal.3d 884, 892, fn. 5 ["At least since the advent of *Wolf v. Colorado* (1949) 338 U.S. 25, we have treated the law under article I, section 19 [now section 13], of our state Constitution as 'substantively equivalent' to the Supreme Court's construction of the Fourth Amendment."].)  On various occasions, however, this court has also decided questions pertaining to the legality of searches and seizures solely under article I, section 13, when the United States Supreme Court had not yet decided the parallel question under the Fourth Amendment.  (See, e.g., *People v. Ruggles* (1985) 39 Cal.3d at 1, 11 ["Rather than await more definitive guidance [from the United States Supreme Court], we turn to article I, section 13 of the California Constitution"]; *People v. Cook* (1985) 41 Cal.3d 373, 376, fn. 1 [similar].)  And on some of those occasions, the high court later spoke to the question and reached a contrary conclusion under the Fourth Amendment.  We have then been confronted with the question whether to adhere to our own precedent construing article I, section 13, as a matter of stare decisis, or instead to abandon our precedent in favor of the high court's decision.  (See *Brisendine*, *supra*, 13 Cal.3d at p. 552 [adhering to *People v. Superior Court (Simon)* (1972) 7 Cal.3d 202, notwithstanding the United States Supreme Court's later decision in *United States v. Robinson*, *supra*, 414 U.S. 218]; *People v. Cook* (1978) 22 Cal.3d 67, 88 [adhering to the rule of *Theodor v. Superior Court* (1972) 8 Cal.3d 77, notwithstanding the United States Supreme Court's later decision in *Franks v. Delaware* (1978) 438 U.S. 154].)

Here, in contrast to many of our earlier cases, the United States Supreme Court has resolved the question before us under the Fourth Amendment.  The question is thus not whether we should abandon our own contrary precedent, and any reliance interests that may have grown up around it, but whether we should

reject the high court's Fourth Amendment guidance.[9]  Confronted with a similar situation in *Teresinski,* in which this court's Fourth Amendment ruling had been overturned by the United States Supreme Court in *United States v. Crews* (1980) 445 U.S. 463, we declined an invitation to reach the same conclusion based on article I, section 13, finding "no reasons . . . to justify rejecting the teaching of the Supreme Court" on the issue presented.  (*Teresinski*, *supra*, 30 Cal.3d at p. 836.) The question is whether adequate reasons are present here to conclude, despite *King*, that California voters exceeded constitutional bounds in mandating the collection of DNA sample from an individual arrested and booked on probable cause to believe he had committed a serious offense.

Defendant argues there are several such reasons.  To begin with, he argues that *King* should be rejected because its central premise is faulty.  *King* concluded that DNA collection from persons arrested for serious offenses serves a legitimate governmental interest in safely and accurately processing and identifying the persons they take into custody.  Defendant argues, however, that arrestee DNA information is not used to determine an arrestee's identity, but "solely for investigation of possible other crimes."  Echoing the dissenting opinion in *King* (*supra*, 569 U.S. at pp. 467–469 (dis. opn. of Scalia, J.)), defendant argues that

---

**9**      The dissenting opinions ask why "the order in which this court decides an issue vis-à-vis the high court" should be of any significance.  (Dis. opn. of Cuéllar, J., *post*, at p. 8; see also dis. opn. of Liu, J., *post*, at p. 12.)  In reviewing this court's past practice, our answer is straightforward:  in instances where this court had previously decided an issue, that decision carried the persuasive force of stare decisis we always accord our own precedents, which had then to be balanced against the persuasive force of the contrary United States Supreme Court decision. In instances where we had not previously decided an issue, no similar counterbalance existed.

gathering DNA information for this purpose is unreasonable in the absence of a warrant or individualized suspicion.

In evaluating defendant's argument, we do not write on a blank slate. As noted, in *Robinson*, *supra*, 47 Cal.4th 1104, this court upheld against a Fourth Amendment challenge the practice of mandatory collection of DNA samples from convicted felons. This court so held precisely because of the capacity of DNA sampling to provide accurate and reliable identification of criminal offenders. This court recognized that DNA samples, like fingerprints, may also be used to establish a suspect's involvement in crimes. (*Id.* at pp. 1120–1121.) Indeed, the DNA sample taken from the defendant in *Robinson* was used for that purpose, and led to his prosecution for an unrelated crime. But this court concluded that the search was reasonable because DNA testing is, like fingerprinting, a means of identification, and "individuals in lawful custody cannot claim privacy in their identification." (*Id.* at p. 1121.)

*Robinson*, like *King*, recognized that suspects can change their names, assume a false identity using forged documents, change their hair color, have tattoos removed, have plastic surgery, and change their eye color with contact lenses. But it is impossible to alter a DNA profile. Thus, as *Robinson* explained, " 'for purposes of identifying "a particular person" as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible.' " (*Robinson*, *supra*, 47 Cal.4th at p. 1134, quoting *State v. Dabney* (Wis. 2003) 663 N.W.2d 366, 372.) " ' "A genetic code describes a person with far greater precision than a physical description or a name." ' " (*Ibid.*) For that reason, this court upheld an arrest warrant describing the arrestee by only his DNA profile. (*Robinson*, at p. 1137.)

California law, like federal law, has also recognized that identification of arrestees is not an end in itself; rather, the primary purpose of identification is to

35

facilitate the gathering of information about the arrestee contained in police records, which in turn informs decisions about how to proceed with the arrestee. (*Loder v. Municipal Court*, *supra*, 17 Cal.3d at pp. 866–867 [upholding limited retention and use of arrest records, including fingerprints and other identifying information].)  Our law is thus consistent with the high court's observation that "[t]he task of identification necessarily entails searching public and police records based on the identifying information provided by the arrestee to see what is already known about him." (*King*, *supra*, 569 U.S. at p. 451.)  "In this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene. . . .  [DNA testing] uses a different form of identification than a name or fingerprint, but its function is the same." (*Ibid.*)

As counsel confirmed at oral argument, defendant does not dispute that it is reasonable for officers to check an arrestee's fingerprints against "electronic databases of known criminals and unsolved crimes." (*King*, *supra*, 569 U.S. at p. 451.)  This, he says, is because fingerprints are capable of serving a "genuine" identification purpose, while a DNA profile is not.  To be sure, a DNA profile is not, at least under present technological conditions, generated immediately or nearly immediately, in the manner of fingerprints.  But as the high court noted in *King*, the immediate availability of fingerprints for identification purposes is also a relatively recent development; before the FBI introduced its electronic fingerprint database in 1999, processing fingerprint submissions often took " 'weeks or months.' " (*Id.* at p. 459.)  Such delays have not been thought to undermine the basic identification purposes of the information.  (See, e.g., *United States v. Kelly* (2d Cir. 1932) 55 F.2d 67, 69, 70 ["Finger printing seems to be no more than an

36

extension of methods of identification long used in dealing with persons under arrest for real or supposed violations . . . ."  "It can really be objected to only because it may furnish strong evidence of a man's guilt."].)

As the high court explained in *King*, "[t]he question of how long it takes to process identifying information obtained from a valid search goes only to the efficacy of the search for its purpose of prompt identification, not the constitutionality of the search." (*King*, *supra*, 569 U.S. at p. 459.)  Even if a DNA profile is not generated until weeks or months after the initial booking, the information it yields about the arrestee and his criminal history can still have an "important bearing" on the processing of the arrestee—whether, for example, to revisit an initial determination to release the arrestee or to impose new release conditions.  (*Id.* at p. 460.)  Information obtained after initial booking may also influence the jailer's decision about where to house the arrestee.

To the extent defendant means to argue that fingerprinting simply makes DNA identification superfluous, we have no adequate basis for concluding that is so.  Fingerprinting and DNA identification are not simply substitutes for one another.  (*Robinson*, *supra*, 47 Cal.4th at p. 1134.)  Fingerprinting alone would not have revealed, for example, that there was an outstanding warrant for the defendant's arrest in *Robinson*.  And as the court in *King* noted, "[i]n considering laws to require collecting DNA from arrestees, government agencies around the Nation found evidence of numerous cases in which felony arrestees would have been identified as violent through DNA identification matching them to previous crimes but who later committed additional crimes because such identification was not used to detain them." (*King*, *supra*, 569 U.S. at p. 454.)

Defendant also argues that we should reject *King* as a matter of state constitutional law because *King* "ignored the highly sensitive nature of the genetic data contained in the collected DNA," and "did not address what federal circuit

37

courts have recognized as the more significant privacy implications posed by the state's subsequent analysis and retention of the sensitive information contained in DNA." The criticism is misplaced. Contrary to defendant's characterization, the court in *King* recognized that the privacy interests at stake extended beyond the "minimally invasive" physical collection of the DNA sample by buccal swab. (*King*, *supra*, 569 U.S. at p. 460.) As noted above, the court acknowledged concerns about the genetic information contained in the collected DNA and its subsequent analysis. It explained that CODIS testing is designed to reveal nothing more about the arrestee than his or her identity, and that state law forbade the use of DNA information for nonidentification purposes. (*Id.* at pp. 464–465.) But the court acknowledged that if scientific advances or other developments mean that CODIS testing will now lead to discovery of personal medical information, a new Fourth Amendment analysis will be required. (*Ibid.*)

We, too, are mindful of the heightened privacy interests in the sensitive information that can be extracted from a person's DNA. These interests implicate not only article I, section 13, but the privacy rights enjoyed by all Californians under the explicit protection of article I, section 1 of the California Constitution. (See, e.g., *Lewis v. Superior Court* (2017) 3 Cal.5th 561, 569.) But our cases have also recognized that safeguards against the wrongful use or disclosure of sensitive information may minimize the privacy intrusion when the government accesses personal information, including sensitive medical information. (E.g., *id.* at pp. 576–577 [upholding the constitutionality of government access to prescription drug record database under article I, section 1 of the California Constitution].) Here, the DNA Act makes the misuse of a DNA sample a felony, punishable by years of imprisonment and criminal fines. (Pen. Code, § 299.5.) These strong sanctions substantially reduce the likelihood of an unjustified intrusion on the suspect's privacy. Like the *King* court, we acknowledge the possibility that

38

technological change might alter the privacy interests at stake, requiring a new constitutional analysis. But we are no more inclined than that court to decide cases on the basis of speculation about future developments that may not come to pass.

Defendant next argues that this court should reject *King* because article I, section 13, gives arrested suspects greater privacy rights than they possess under the Fourth Amendment. Defendant points to decisions of this court holding that article I, section 13 forbids officers from conducting so-called " 'accelerated booking search[es]' " in the field at the time of arrest (*People v. Laiwa* (1983) 34 Cal.3d 711, 726–728); from conducting full body searches of arrested suspects before determining whether they will be cited and released without being booked (*People v. Longwill* (1975) 14 Cal.3d 943, 951–952 (*Longwill*)); and from conducting searches of personal effects incident to a citation or arrest for a traffic violation, absent reason to believe the effects contain weapons or contraband (*Brisendine*, *supra*, 13 Cal.3d at pp. 548–552; *People v. Norman* (1975) 14 Cal.3d 929, 938). In the latter cases, we rejected the rule of *United States v. Robinson*, *supra*, 414 U.S. 218, which, as we described it in *Longwill*, permits "full body searches of all individuals subjected to custodial arrest," as well as their effects, "regardless of the offense, and regardless of whether the individual is ultimately to be incarcerated." (*Longwill*, *supra*, 14 Cal.3d at p. 951.)

But what motivated these decisions was not principally a difference in opinion with the federal courts about the scope of legitimate privacy rights of persons subject to custodial arrest. California law and federal law alike recognize that an arrestee has reduced privacy interests upon being taken into police custody, but that reduced privacy interests do not mean zero privacy interests—which is to say, "[n]ot every search 'is acceptable solely because a person is in custody.' " (*Riley v. California*, *supra*, 134 S.Ct. at p. 2488, quoting *King*, *supra*, 569 U.S. at

39

p. 463.)  Rather, the cases on which defendant relies all turn on a different evaluation of legitimate law enforcement needs when arresting suspects in the field.  As relevant here, this court concluded that the rationales for conducting full booking searches before a defendant enters custody do not apply to all persons cited or arrested in the field, since "it is factually demonstrable that a substantial number of the arrestees will never see the inside of a jail cell."  (*Longwill*, *supra*, 14 Cal.3d at p. 951.)  In each case, we explained, "the same factors are operative: the potential harm to the officer if the arrestee is armed justifies a limited weapons search, but a full booking search is 'inappropriate in the context of an arrestee who will never be subjected to that process.' "  (*Id.* at p. 950, quoting *Brisendine*, *supra*, 13 Cal.3d at p. 547.)

The question before us, by contrast, does not concern the constitutionality of a booking search conducted immediately upon arrest, but a booking search conducted at *the time of booking*, and justified by an interest in accurate identification that applies to all persons who are taken into police custody following a valid arrest for a serious offense.  Cases concluding that full booking searches are inappropriate for arrestees who will never be booked into jail are thus of limited relevance here.

Finally, defendant argues that even if the differences between the DNA Act and the law at issue in *King* do not alter the Fourth Amendment analysis, they should alter the state constitutional analysis.  For reasons already given, these differences do not change our assessment of the constitutionality of the DNA Act as applied in defendant's case.  Officials asked defendant for a DNA sample upon booking, after he was arrested on probable cause for a serious offense, and as he was entering pretrial detention.  Under the circumstances before us, the requirement was not unreasonable.

# IV.

Our holding today is limited.  The sole question before us is whether it was reasonable, under either the Fourth Amendment or article I, section 13 of the California Constitution, to require the defendant in this case to swab his cheek as part of a routine jail booking procedure following a valid arrest for felony arson.  Because we conclude the requirement was reasonable as applied to defendant, we hold he is subject to the statutory penalties prescribed in Penal Code section 298.1.

Although defendant was arrested on probable cause for felony arson and was ultimately convicted of that offense, our dissenting colleagues argue that we should reach beyond the facts of the case before us to strike down some or all of the DNA Act's provisions as they apply to other categories of arrestees.  They argue that we should consider defendant's reasonable expectations about the use and retention of his DNA sample at the time of booking, and we should do so from behind a "veil of ignorance," treating defendant as though his circumstances were "indistinguishable" from a suspect who is wrongly or pretextually arrested, or against whom charges are never brought, or who is ultimately acquitted of any charged offenses.  (Dis. opn. of Cuéllar, J., *post*, at p. 28; see also dis. opn. of Liu, J., *post*, at pp. 1–2.)

In assessing whether the demand for a sample of an arrestee's DNA was reasonable under article I, section 13, we agree that it may be appropriate to consider not only the minimal nature of the physical intrusion associated with a buccal swab, but the arrestee's reasonable expectations about what would happen to the sample after collection.  But in so analyzing the arrestee's choice, we cannot ignore the safeguards built into the DNA Act:  the limited nature of the information stored in databases on an arrestee (specifically, a numerical profile describing noncoding parts of the arrestee's DNA); the legal protections against possible misuse of the profile or the sample (including felony sanctions for

41

knowing improper use or dissemination); and the availability of procedures for removing the profile from the database and destroying the sample should the basis for the arrestee's inclusion dissipate. We have no record before us to show that these legal protections would have been violated or proved unworkable had defendant chosen to comply with the requirement to provide a DNA sample on booking. And we note, as a purely practical matter, whatever apprehension defendant might have had about the adequacy of the Act's protections for individuals who are found to have been wrongly arrested, for example, would certainly have been mitigated by his own knowledge of the circumstances of his arrest. (Here, the record shows that defendant knew from the outset that he had been apprehended in the act of setting fire to the tires of a police car and anticipated that he would be prosecuted for his acts, to which he would later confess at trial. (See fn. 4, *ante*.)) To be sure, as explained above, defendant was entitled to the full scope of constitutional protection against unreasonable searches, despite his arrest on evident probable cause. And had he later found himself in a position to seek expungement of his sample and profile and found the statutory procedures inadequate, he would have been entitled to challenge the retention of his information on that basis.

Not all arrestees will be comparably situated to the defendant in this case. An individual who, unlike defendant, is arrested in the absence of probable cause might reasonably anticipate that charges will never be brought and any attempted prosecution will inevitably fail.[10] And such an arrestee may, at least in some

---

[10] Justice Liu (dis. opn., *post*, at p. 9) invokes language from *Florida v. Bostick* (1991) 501 U.S. 429, 437–438, which decided a question of detention in the context of random police requests to search bus passengers' luggage. The point of the cited passage of *Bostick* is that a person's knowledge he or she has something to hide does not convert a consensual encounter into a detention. The

*(footnote continued on next page)*

circumstances, have a valid as-applied challenge to the adequacy of the DNA Act's expungement procedures or to application of the Act's other operative provisions, in addition to the other remedies available for unlawful arrest. (Cf. *People v. McInnis*, *supra*, 6 Cal.3d at p. 826 [photograph taken pursuant to an illegal arrest could be shown to a witness asked to identify the perpetrator of a subsequent crime where there was no evidence the police had " 'exploited' " the earlier illegal arrest].) We note that a group of plaintiffs in federal court have already challenged the law's application to those who are never charged with any crime. (See *Haskell v. Harris* (filed July 18, 2014, N.D.Cal. Civ. Case No. C 09-04779 CRB, docket #146), Motion to Create Subclasses, p. 1 [seeking certification of subclass consisting of arrestees compelled to submit samples under DNA Act "unless they are actually charged with a felony offense"].) We of course take no view on the merits of any such challenges. We only note them for purposes of contrast with this case, in which defendant bases his challenge to his misdemeanor refusal conviction on the potential for constitutional deprivation under circumstances that are not, in fact, present here.

To entertain defendant's arguments here would convert our decision in this case, which concerns only the validity of defendant's conviction for violation of Penal Code section 298.1, into the equivalent of facial constitutional review of the DNA Act as it might be applied to other arrestees. But the DNA Act itself instructs that the validity of the Act as applied to defendant does not depend on its

*(footnote continued from previous page)*

passage tells us nothing about how to judge the depth of privacy intrusion involved in a postarrest demand for a DNA sample based not on the collection of the sample itself, but based on the likelihood of future use or retention of the sample under various conditions that did not, in fact, obtain in this case.

validity as it might apply to others.  (Prop. 69, *supra*, § V, subd. (b); see p. 6, *ante*.)  And our jurisprudence likewise counsels us to follow a narrower course. While "passing on the validity of a law wholesale may be efficient in the abstract," the law teaches that we should ordinarily focus on the circumstances before us in determining whether the work of a coequal branch of government may stand or must fall.  (*Sabri*, *supra*, 541 U.S. at p. 609.)  We accordingly abide by what has been called a " 'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more.' "  (*People v. Contreras* (2018) 4 Cal.5th 349, 381.)

In sum:  Defendant raises a number of concerns about the potential application of the DNA Act in other cases involving other, differently situated arrestees.  He also raises concerns that changes in technology might open up new prospects for using his DNA samples and profiles in ways that are uniquely invasive of personal privacy.  We are mindful of these concerns, and we recognize that the DNA Act may raise additional constitutional questions that will require resolution in other cases.

In addressing the concerns defendant has raised here, however, we are also mindful of our role in reviewing a law duly enacted by California voters in the exercise of their initiative power.  We have often said that "it is our solemn duty to jealously guard" the initiative power secured by the California Constitution, and that we accordingly may not strike down voter measures "unless their unconstitutionality clearly, positively, and unmistakably appears."  (*Legislature v. Eu* (1991) 54 Cal.3d 492, 501.)  Whatever else this duty might entail, it surely entails an obligation to avoid invalidating the work of the California electorate on the ground that "the law would be unconstitutionally applied to different parties and different circumstances from those at hand."  (*Sabri*, *supra*, 541 U.S. at p. 609; see *Cregler*, *supra*, 56 Cal.2d at p. 313.)

44

The judgment of the Court of Appeal is reversed.

**KRUGER, J**.

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**

**DISSENTING OPINION BY LIU, J.**

According to today's opinion, "[t]he sole question before us is whether it was reasonable, under either the Fourth Amendment or article I, section 13 of the California Constitution, to require the defendant in this case to swab his cheek as part of a routine jail booking procedure *following a valid arrest for felony arson*." (Maj. opn., *ante*, at p. 41, italics added.) This statement of the issue is misleading.

The DNA Fingerprint, Unsolved Crime and Innocence Protection Act (DNA Act) requires collection of DNA from all adult felony arrestees "immediately following arrest" and requires samples to be "forwarded immediately" to the laboratory for analysis. (Pen. Code, § 295(i)(1)(A), (C).) Buza was arrested on January 21, 2009. At booking a few hours later, a police officer requested a cheek swab from Buza under penalty of law. Buza refused. It was not until the next day, January 22, 2009, that a judge found probable cause to believe Buza committed arson. On January 23, 2009, the district attorney filed a complaint charging Buza with arson and related offenses as well as unlawful refusal to provide a DNA specimen on January 21, 2009 (*id.*, § 298.1, subd. (a)). The question is whether Buza can be convicted of refusing to provide his DNA at booking *prior to any judicial determination of whether he was validly arrested*. Today's opinion does not explain why the fact that Buza was found "validly arrested on probable cause to believe he had committed felony arson, and . . . was promptly charged with (and ultimately convicted of) that offense" (maj. opn., *ante*, at p. 15) has any bearing on whether it was lawful to require him to provide his DNA *before any of those determinations were made*.

The court says that a "valid arrest" in this context does not require "a judicial determination of its validity." (Maj. opn., *ante*, at p. 23.) But this assertion, even if true, does not disturb the main premise of the question presented: *For purposes of constitutional analysis, Buza is no different than any felony arrestee who has not been charged, convicted, or found by a neutral magistrate to be lawfully detained.* This point is critical because it brings into focus the startling breadth of DNA collection and retention authorized by the statute. This is not a scheme carefully calibrated to identify felony offenders. Instead, it can be fairly described as a biological dragnet. As explained below, and for the reasons stated in Justice Cuéllar's dissent, the DNA Act violates the prohibition on unreasonable searches and seizures in the California Constitution.

According to the Office of the Attorney General, there are 200,000 to 300,000 felony arrests in California every year. (Cal. Dept. of Justice, Crime in California 2016 (Aug. 17, 2017) p. 49.) But not all arrests end in convictions; far from it. Here are the Attorney General's data on dispositions of adult felony arrests for each year since 2009, when the DNA Act started requiring all such arrestees to provide DNA samples immediately upon arrest:

| | Total | Law enforcement releases | | Complaints denied | | Dismissed, acquitted | | Convicted | |
|---|---|---|---|---|---|---|---|---|---|
| | # | # | % | # | % | # | % | # | % |
| **2016** | 207,022 | 7,058 | 3.4 | 36,588 | 17.7 | 25,961 | 12.5 | 137,415 | 66.4 |
| **2015** | 242,460 | 7,537 | 3.1 | 38,733 | 16.0 | 33,908 | 14.0 | 162,282 | 66.9 |
| **2014** | 315,782 | 10,227 | 3.2 | 48,235 | 15.3 | 39,632 | 12.6 | 217,688 | 68.9 |
| **2013** | 305,503 | 10,525 | 3.4 | 45,273 | 14.8 | 36,315 | 11.9 | 213,390 | 69.8 |
| **2012** | 295,465 | 9,572 | 3.2 | 48,029 | 16.3 | 35,451 | 12.0 | 202,413 | 68.5 |
| **2011** | 292,231 | 9,780 | 3.3 | 45,988 | 15.7 | 40,642 | 13.9 | 195,821 | 67.0 |
| **2010** | 298,647 | 9,980 | 3.3 | 46,054 | 15.4 | 40,793 | 13.7 | 201,820 | 67.6 |
| **2009** | 306,170 | 9,894 | 3.2 | 43,317 | 14.1 | 45,000 | 14.7 | 207,959 | 67.9 |
| **Total** | **2,263,280** | **74,573** | **3.3** | **352,217** | **15.6** | **297,702** | **13.2** | **1,538,788** | **68.0** |

(*Id*. at table 37, p. 49.) These data show that from 2009 to 2016, nearly one in five felony arrests did not result in prosecution, and almost one in three — a total of 724,492 arrests — did not result in a conviction.

Each of those arrests triggered the requirement to provide a DNA sample. Yet the state has no legal basis for retaining the DNA sample or profile if no charges are filed, if the charges are dismissed, if the person is acquitted or found not guilty or factually innocent, or if the conviction is reversed and the case is dismissed, unless there is some other basis such as a prior offense that qualifies the person for inclusion in the state DNA database. (Pen. Code, § 299, subds. (a), (b).) The Judicial Council of California, pursuant to its reporting obligations under Penal Code section 1170.45, has reported that from 2009 to 2016, between 15 and 20 percent of felony arrestees had no criminal record, between 14 and 19 percent had one or more prior prison commitments, and around 66 percent had a criminal record with no prior prison commitment (so-called " 'miscellaneous' " records), a category that presumably includes arrestees with only misdemeanor convictions for which DNA collection is not authorized. (See, e.g., Jud. Council of Cal., Disposition of Criminal Cases According to the Race and Ethnicity of the Defendant (Sept. 20, 2017) p. 15 (Disposition of Criminal Cases) [15 percent of felony arrestees in 2016 had no criminal record, 19 percent had one or more prior prison commitments, 66 percent had miscellaneous records]; Jud. Council of Cal., Disposition of Criminal Cases According to the Race and Ethnicity of the Defendant (2011) [20 percent of felony arrestees in 2009 had no criminal record, 14 percent had one or more prior prison commitments, 66 percent had miscellaneous records].) The percentage of felony arrestees with no prior convictions or only misdemeanor convictions is likely higher among those who are not charged or not convicted than among felony arrestees overall. Thus, even assuming that a substantial portion of the 724,492 arrests from 2009 to 2016 that resulted in no conviction involved persons with a prior (or subsequent)

3

qualifying offense, there are tens if not hundreds of thousands of individuals who have been required to provide DNA samples that the state has no legal basis for retaining.

The statute sets forth a process for expungement, but this process is not adequate to allay constitutional concerns. In contrast to the automatic expungement provisions of the state law at issue in *Maryland v. King* (2013) 569 U.S. 435, 443–444 (*King*), California's DNA Act provides that a person seeking expungement "must send a copy of his or her request to the trial court of the county where the arrest occurred, or that entered the conviction or rendered disposition in the case, to the DNA Laboratory of the Department of Justice, and to the prosecuting attorney of the county in which he or she was arrested or[] convicted[] or adjudicated, with proof of service on all parties." (Pen. Code, § 299, subd. (c)(1).) The Department of Justice "shall destroy" the DNA specimen, sample, and searchable profile "upon receipt of a court order that verifies the applicant has made the necessary showing at a noticed hearing, and that includes all of the following: [¶] (A) The written request for expungement pursuant to this section. [¶] (B) A certified copy of the court order reversing and dismissing the conviction or case, or a letter from the district attorney certifying that no accusatory pleading has been filed or the charges which served as the basis for collecting a DNA specimen and sample have been dismissed prior to adjudication by a trier of fact, the defendant has been found factually innocent, the defendant has been found not guilty, the defendant has been acquitted of the underlying offense, or the underlying conviction has been reversed and the case dismissed. [¶] (C) Proof of written notice to the prosecuting attorney and the Department of Justice that expungement has been requested. [¶] (D) A court order verifying that no retrial or appeal of the case is pending, that it has been at least 180 days since the defendant or minor has notified the prosecuting attorney and the Department of Justice of the expungement request, and that the court has not received an objection from the Department of Justice or the prosecuting attorney." (*Id.*, subd. (c)(2).)

4

The extensive documentation, notice to multiple parties, judicial hearing, and additional steps required for expungement place a significant burden on eligible persons, assuming they are even aware of the process. In addition, although the statute says a person whose arrest resulted in no charge or conviction "shall have his or her DNA specimen and sample destroyed and searchable database profile expunged" if the state has "no legal basis for retaining" them (Pen. Code, § 299, subd. (a)), the statute also says: "The court has the discretion to grant or deny the request for expungement. The denial of a request for expungement is a nonappealable order and shall not be reviewed by petition for writ." (*Id.*, § 299, subd. (c)(1).) It is not clear what "discretion" the court may exercise in deciding whether to grant or deny a request, or what remedy is available if the court denies a valid request. Further, it is not clear what consequence ensues if the state does not comply with a court order granting a request for expungement. (*Id.*, § 299, subd. (d) ["Any identification, warrant, probable cause to arrest, or arrest based upon a databank or database match is not invalidated due to a failure to expunge or a delay in expunging records."].)

The Department of Justice has sought to expedite the process by creating a "Streamlined DNA Expungement Application Form." (Cal. Dept. of Justice, Proposition 69 (DNA) <https://oag.ca.gov/bfs/prop69> [as of Apr. 2, 2018] ["Remove Your DNA Sample from the DNA Database"]; cf. 34 U.S.C. § 12592(d)(2) [requiring states to "promptly expunge" the DNA analysis of qualified persons as a condition of state access to the DNA index maintained by the FBI].) But the reality is that few DNA samples, once collected, are ever removed.

The Department of Justice DNA Laboratory publishes monthly reports on the number of samples added or removed from its inventory as well as historical totals since the DNA collection program began in 2004. As of February 2018, the DNA Laboratory had received 2,792,083 DNA samples and had removed 44,314 samples, or 1.6 percent, since the program began. (Cal. Dept. of Justice, Proposition 69 (DNA)

<https://oag.ca.gov/bfs/prop69> [February statistics as of Mar. 28, 2018] ["DNA Laboratory Monthly Statistics, pdf"].)  As of December 2008, the DNA Laboratory had removed 22,269 DNA samples from its inventory since the program began; these removals include "Expunged, Removed or Failed Samples, or where a New Sample was Requested."  (Appellees' Response to Appellants' Request for Judicial Notice; Supplemental Request for Judicial Notice and Supporting Declaration of Daniel J. Powell, *Haskell v. Harris* (filed Sept. 20, 2012, 9th Cir. case No. 10-15152) docket #103, Ex. A, p. 24; see *Haskell v. Harris* (9th Cir. 2014) 745 F.3d 1269 (en banc).)  Even if we assume that all reported removals are expungements, the total number of expungements from January 2009, when the current DNA law went into effect, until February 2018 would be only 22,045 — i.e., the difference between 44,314 (the total number of removals through February 2018) and 22,269 (the total number of removals through December 2008).  This is a small fraction of the large population of individuals since 2009 whose felony arrests have resulted in no charge or conviction, and who have no other basis for inclusion in the state DNA database.  It is questionable whether the vast majority of people entitled to expungement even know about the process much less know how to navigate it.  Indeed, we have no indication that any responsible official is ever required to inform an arrestee about the expungement process.

The state's retention of DNA is troubling not only because of its sheer magnitude but also because it predictably burdens certain groups.  African Americans, who are 6.5 percent of California's population, made up 20.3 percent of adult felony arrestees in 2016.  (U.S. Census Bureau, QuickFacts: California (July 1, 2016) <https://www.census.gov/quickfacts/CA> [as of Apr. 2, 2018]; Crime in California 2016, *supra*, at p. 36.)  Yet they comprised 24.3 percent of felony arrestees who were released by law enforcement or the prosecuting attorney in 2016 before any court disposition. (Disposition of Criminal Cases, *supra*, at p. 10.)  Non-Hispanic whites, by contrast, comprised 31.2 percent of felony arrestees but only 27.0 percent of felony arrestees

6

released by law enforcement or the prosecuting attorney. (Crime in California 2016, *supra*, at p. 36; Disposition of Criminal Cases, *supra*, at p. 10.) The fact that felony arrests of African Americans disproportionately result in no charges or dropped charges means that African Americans are disproportionately represented among the thousands of DNA profiles that the state has no legal basis for retaining.

Penal Code section 297, subdivision (c)(2) provides an alternative route for expungement: "The law enforcement investigating agency submitting a specimen, sample, or print impression to the DNA Laboratory of the Department of Justice or law enforcement crime laboratory pursuant to this section shall inform the Department of Justice DNA Laboratory within two years whether the person remains a suspect in a criminal investigation. Upon written notification from a law enforcement agency that a person is no longer a suspect in a criminal investigation, the Department of Justice DNA Laboratory shall remove the suspect sample from its databank files and databases. However, any identification, warrant, arrest, or prosecution based upon a databank or database match shall not be invalidated or dismissed due to a failure to purge or delay in purging records." But it is not clear how this process, which relies on the initiative of law enforcement, is monitored or enforced; the language of the statute, like Penal Code section 299, expressly contemplates "failure" or "delay" by responsible officials. In any event, this expungement process may take up to two years after a person's DNA is sent to the laboratory, during which time the sample remains available to law enforcement even if the person was never charged or convicted of a crime.

The court says it need not consider the adequacy of the expungement process because Buza was "charged with and ultimately convicted of a qualifying crime." (Maj. opn., *ante*, at p. 28.) But the question is whether it was constitutional to require Buza to provide his DNA after his arrest on January 21, 2009 — *before* he was charged or convicted. In answering this question, it certainly matters how his DNA would be analyzed, used, and retained, and we must address these considerations from the vantage

7

point that existed at the time Buza was required to provide his DNA. (See *People v. Gale* (1973) 9 Cal.3d 788, 795 [" 'The question of the reasonableness of the officers' conduct is determined on the basis of the information possessed by the officer *at the time a decision to act is made*.' "].) We cannot ignore the (in)adequacy of expungement — the statute's only safeguard against overbroad retention — based on the fortuity that Buza turned out to be guilty. (See *McDonald v. United States* (1948) 335 U.S. 451, 453 [the "guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike"].)

In addition, the court says collecting DNA from an arrestee before a judge has determined the validity of the arrest is analogous to a search incident to arrest, "where a valid arrest is also essential [and] there is no such preapproval requirement." (Maj. opn., *ante*, at p. 23.) But a search incident to arrest is justified and limited by the immediate need to "protect[] arresting officers and safeguard[] any evidence of the offense of arrest that an arrestee might conceal or destroy." (*Arizona v. Gant* (2009) 556 U.S. 332, 339.) DNA collection upon arrest does not serve any similarly pressing purpose. (Dis. opn. of Cuéllar, J., *post*, at pp. 13–14 [it takes around 30 days to generate an identification profile from an arrestee's DNA sample].) Moreover, when an arrest is later found invalid by a neutral magistrate, a search incident to the arrest is deemed unlawful, and the evidence obtained is subject to suppression. (See *People v. Macabeo* (2016) 1 Cal.5th 1206, 1219.) The DNA Act does not deem unlawful the collection of DNA pursuant to an arrest that is later found invalid; such DNA may be retained and used by law enforcement so long as there is no request for expungement.

The court further contends that "whatever apprehension defendant might have had about the adequacy of the Act's protections for individuals who are found to have been wrongly arrested, for example, would certainly have been mitigated by his own knowledge of the circumstances of his arrest. (Here, the record shows that defendant knew from the outset that he had been apprehended in the act of setting fire to the tires of

8

a police car and anticipated that he would be prosecuted for his acts, to which he would later confess at trial.  (See fn. 4, *ante*.)) . . . .  [¶] Not all arrestees will be comparably situated to the defendant in this case.  An individual who, unlike defendant, is arrested in the absence of probable cause might reasonably anticipate that charges will never be brought and any attempted prosecution will inevitably fail."  (Maj. opn., *ante*, at p. 42, fn. omitted.)  This seems to suggest that arrestees who know they are guilty are entitled to lesser constitutional protection than arrestees who believe they are innocent.  Such reasoning contravenes the fundamental principle that "the 'reasonable person' test [in search and seizure analysis] presupposes an *innocent* person.  See [*Florida v. Royer* (1983) 460 U.S. 491, 519, fn. 4] (Blackmun, J., dissenting) ('The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position').  Accord, [*Michigan v. Chesternut* (1988) 486 U.S. 567, 574] ('This "reasonable person" standard . . . ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached')."  (*Florida v. Bostick* (1991) 501 U.S. 429, 438.)  If we are going to make the constitutional analysis turn on whether the defendant "knew from the outset" that he was guilty, then we might as well dispense with much of seizure and seizure law.  (See *People v. Schmitz* (2012) 55 Cal.4th 909, 947 (conc. & dis. opn. of Liu, J.) [search and seizure doctrine "is built on cases involving guilty people"].)

I have no doubt that law enforcement is aided by the collection and retention of massive numbers of DNA profiles, whether those profiles are used to confirm a person's identity, to facilitate access to criminal history or other information about a person, or to help solve unsolved crimes.  But if those interests are enough to justify the collection and retention of DNA from persons who are arrested but not convicted, not charged, or not even found to be lawfully detained so long as they do not seek expungement, then it is not that far a step for the state to collect and retain DNA from law-abiding people in

9

general, including anyone who "applies for a driver's license" or "attends a public school." (*King*, *supra*, 569 U.S. at p. 482 (dis. opn. of Scalia, J.).) Such broad-based policies would similarly aid law enforcement while having the virtue of being less discriminatory in their effects.

Indeed, the court's analogy to fingerprinting, a less invasive and less powerful technology, should give us pause. (Maj. opn., *ante*, at pp. 35–37; see dis. opn. of Cuéllar, J., *post*, at pp. 19–22.) State law already requires individuals to provide a fingerprint in order to get a driver's license (Veh. Code, § 12800, subd. (c)), to become a school teacher (Ed. Code, § 44340), to be a professional engineer (Cal. Code Regs., tit. 16, § 420.1), to be a practicing attorney (Bus. & Prof. Code, § 6054, subd. (b)), or to join many other occupations (*id.*, § 144 [requiring "a full set of fingerprints for purposes of conducting criminal history record checks" from applicants to 29 state licensing boards, including nurses, pharmacists, physicians, court reporters, funeral directors, guide dog instructors, contractors, and accountants]). These requirements serve important public safety and law enforcement purposes. But if DNA matching is constitutionally justified by its unparalleled efficacy in serving the " 'same' " identification " 'function' " as fingerprinting (maj. opn., *ante*, at p. 36, quoting *King*, *supra*, 569 U.S. at p. 451), then it is not clear what constitutional principle stands in the way of requiring a DNA sample in every context where the law now requires a fingerprint. (See *King*, at p. 451 ["the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides"].) One need not be a diehard civil libertarian to have serious qualms about where all of this may lead.

I conclude with a few words about the court's approach to state constitutional analysis against the backdrop of *King*. Today's opinion affirms that "the California Constitution is, and has always been, 'a document of independent force' [citation] that sets forth rights that are in no way 'dependent on those guaranteed by the United States

10

Constitution' (Cal. Const., art. I, § 24)." (Maj. opn., *ante*, at p. 30.) And the court is correct that "although decisions of the United States Supreme Court interpreting parallel federal text are not binding, we have said they are 'entitled to respectful consideration.' " (*Id.* at p. 31.) But the court errs in framing the inquiry as "whether adequate reasons are present here to conclude, despite *King*," that the DNA Act is unconstitutional. (*Id.* at p. 34.) In analyzing the state constitutional issue, the court takes *King* as the starting point and asks "whether we should reject the high court's Fourth Amendment guidance." (*Id.* at pp. 33–34, fn. omitted.) In so doing, the court appears to accord *King* "a presumption of correctness that has no sound basis in our federal system." (Liu, *State Constitutions and the Protection of Individual Rights: A Reappraisal* (2017) 92 N.Y.U. L.Rev. 1307, 1314.)

"Just as the Supreme Court, when interpreting a provision of the Federal Constitution, does not accord a presumption of correctness to any state's interpretation of an analogous state constitutional provision or even to an interpretation adopted by a majority of states, there is no reason why a state court, when interpreting a provision of its state constitution, should accord a presumption of correctness to the Supreme Court's interpretation of an analogous federal constitutional provision. State courts should and often do give respectful consideration to relevant Supreme Court decisions, just as they often give respectful consideration to relevant decisions of sister states. And state courts may often be persuaded that the Supreme Court's approach is correct and worthy of adoption, just as they may often be persuaded by a majority view among state high courts. But the crucial point is that state courts, as the ultimate arbiters of state law, have the prerogative and duty to interpret their state constitutions *independently*." (Liu, *supra*, 92 N.Y.U. L.Rev. at pp. 1314–1315.)

As Justice Cuéllar notes, today's opinion provides no convincing rationale for why our analytical approach to a state constitutional issue should depend on "the order in which this court decides an issue vis-à-vis the high court." (Dis. opn. of Cuéllar, J., *post*,

11

at p. 8.) The court's response is that "in instances where this court had previously decided an issue, that decision carried the persuasive force of stare decisis we always accord our own precedents, which had then to be balanced against the persuasive force of the contrary United States Supreme Court decision. In instances where we had not previously decided an issue, no similar counterbalance existed." (Maj. opn., *ante*, at p. 34, fn. 9.) But this statement of the obvious misses the point. It does not explain why our approach should be different (1) when we consider a state constitutional issue of first impression on which the high court has spoken under federal law, as compared to (2) when we consider a state constitutional issue of first impression on which the high court has not spoken under federal law. To be sure, in scenario (1) we should give respectful consideration to the views of the high court, as well as the views of other state courts that have decided the issue under their states' laws. But our duty to interpret the California Constitution independently is no different in scenario (1) than in scenario (2). We may decide, in our independent judgment, that the views of the high court should be followed. But that is different from the mode of analysis in today's opinion, which accords a presumption of correctness to the high court's decision in *King* and then asks whether there are "sufficient reasons" to depart from *King*. (*Id*. at p. 32, fn. 8.)

Moreover, the court fundamentally missteps in attributing its deferential reading of *King* to " 'the fact that to [the high court] has been committed, by the consent of the states, the ultimate vindication of liberty and property against arbitrary and unconstitutional state legislation.' " (Maj. opn., *ante*, at p. 31.) It is of course true that the United States Supreme Court serves as a backstop against state infringements on constitutional rights, and when the high court issues a federal constitutional ruling, state courts "shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) But that is not a reason for state courts to treat the floor of constitutional rights under federal law as a presumptive ceiling on constitutional rights under state law. Doing so runs counter to the basic precept that

12

" ' "federalism secures to citizens the liberties that derive from the diffusion of sovereign power." ' " (*Bond v. United States* (2011) 564 U.S. 211, 221.) "The Framers concluded that allocation of powers between the National Government and the States enhances freedom" (*ibid.*), and a crucial feature of this freedom-enhancing allocation of powers is judicial federalism: "state courts no less than federal are and ought to be the guardians of our liberties" (Brennan, *State Constitutions and the Protection of Individual Rights* (1977) 90 Harv. L.Rev. 489, 491). "State courts interpreting state law remain particularly well situated to enforce individual rights against the States. Institutional constraints, it has been observed, may limit the ability of [the United States Supreme] Court to enforce the federal constitutional guarantees. Sager, Fair Measure: The Legal Status of Underenforced Constitutional Norms, 91 Harv.L.Rev. 1212, 1217–1218 (1978). Prime among the institutional constraints, [the United States Supreme] Court is reluctant to intrude too deeply into areas traditionally regulated by the States. This aspect of federalism does not touch or concern state courts interpreting state law." (*Arizona v. Evans* (1995) 514 U.S. 1, 30–31 (dis. opn. of Ginsburg, J.).) I do not see how deferring to high court decisions under federal law when we construe parallel provisions of state law serves the basic purposes of federalism, and the court has no answer on this point.

Notwithstanding today's opinion, this court is no stranger to the importance of judicial federalism. In *People v. Cahan* (1955) 44 Cal.2d 434, we adopted the exclusionary rule for violations of the state constitutional prohibition on unreasonable searches and seizures, declining to follow the high court's refusal to adopt a federal exclusionary rule in *Wolf v. Colorado* (1949) 338 U.S. 25. In *People v. Wheeler* (1978) 22 Cal.3d 258, we held that a prosecutor's exercise of a racially motivated peremptory strike in an individual case violates the state constitutional right to be tried by a fair and impartial jury, declining to follow the contrary federal constitutional rule set forth in *Swain v. Alabama* (1965) 380 U.S. 202. And in *In re Marriage Cases* (2008) 43 Cal.4th 757, we held that laws denying same-sex couples the right to marry violate equal

13

protection under the state constitution, even though the only high court authority on point at the time, *Baker v. Nelson* (1972) 409 U.S. 810, had dismissed a similar appeal for want of a substantial federal question.

In each of these instances, we interpreted the guarantees of our state constitution without according any deference or presumption of correctness to high court precedent. And on each of these issues, the high court eventually overruled its precedent and adopted as a matter of federal law the rule we had adopted as a matter of state law. (See *Mapp v. Ohio* (1961) 367 U.S. 643, 651–653 [overruling *Wolf* and citing *Cahan*]; *Batson v. Kentucky* (1986) 476 U.S. 79, 82–82 & fn. 1 (1986) [overruling *Swain* and citing *Wheeler*]; *Obergefell v. Hodges* (2015) 576 U.S. __, __, __ [135 S.Ct. 2584, 2605, 2610] [overruling *Baker* and citing *In re Marriage Cases*].) These examples show how the exercise of independent judgment by state courts in our system of judicial federalism provides a crucial safeguard for constitutional rights.

Instead of looking to these examples, today's opinion cites *Gabrielli v. Knickerbocker* (1938) 12 Cal.2d 85, which rejected a state constitutional challenge to a law requiring schoolchildren to salute and pledge allegiance to the flag. (Maj. opn., *ante*, at p. 31.) I would not rely on such dubious precedent. Whatever may be said about the merits of the issue, the court's analysis in *Gabrielli* consists of little more than uncritical acceptance of United States Supreme Court decisions that had rejected similar claims under the federal Constitution. (See *Gabrielli*, at p. 89 ["[C]ogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution."], quoted in maj. opn., *ante*, at p. 31.) Five years later, the high court overruled its precedent and decided the issue the other way in *West Virginia State Board of Education v. Barnette* (1943) 319 U.S. 624.

In sum, we should not indulge any suggestion that the job of protecting individual rights in our federal system belongs primarily to the United States Supreme Court or that

14

the high court is invariably better positioned than state supreme courts to discharge that critical function. Because I do not agree with the court's analysis of the state constitutional question presented or its judgment upholding Buza's conviction for refusing to provide a DNA sample just hours after his arrest, I respectfully dissent. Having concluded that Buza's conviction for refusing to comply with the DNA Act is invalid under the California Constitution, I express no view on whether it is also invalid under the Fourth Amendment.

**LIU, J.**

**WE CONCUR:**

**CUÉLLAR, J.**
**PERLUSS, J.**\*

---

\*    Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DISSENTING OPINION BY CUÉLLAR, J.**

In California people are protected not only by federal constitutional guarantees against unreasonable searches or seizures, but by state constitutional provisions governing privacy and prohibiting arbitrary coercion. These protections require courts to distinguish between routine lawful procedures, such as those governing collection of biological samples from convicts, and arbitrary commands purporting to force people who have not been convicted of anything to surrender their most private information. (See *Riley v. California* (2014) 573 U.S. ___, ___ [134 S.Ct. 2473, 2488] (*Riley*) ["Not every search 'is acceptable solely because a person is in custody.' "]; *White v. Davis* (1975) 13 Cal.3d 757, 766 (*White*) ["The inherent legitimacy of the police 'intelligence gathering' function does not grant the police the unbridled power to pursue that function by any and all means. In this realm, as in all others, the permissible limits of governmental action are circumscribed by the federal Bill of Rights and the comparable protections of our state Constitution."].) Yet the majority today sanctions the collection and analysis of DNA samples from all adults arrested on felony charges — fully one-third of all arrestees — regardless of whether those individuals will ever be charged with a crime or, if charged, ever convicted. As Justice Liu explains in more detail, over half of these individuals are released before a judicial determination of probable cause. But at whatever point the arrestees are released, their DNA sample stays with the government until the expungement process, which burdens individuals and is contingent rather than automatic, runs its course if it ever does.

For all these individuals, the majority provides no protection — except to say that if they are exonerated, they may file written requests for the expungement of their DNA records. In so holding, the majority sidesteps the problems associated with the collection and expungement procedures of Proposition 69, the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (DNA Act or the Act). It contends that the scope of the legitimate privacy rights of persons arrested is no different under our constitution than under the Fourth Amendment to the federal Constitution and, by implication, that our own constitution plays no role in determining whether the rights of a California citizen subjected to a search of his person and collection of his DNA have been violated. I cannot agree.

Our state Constitution provides heightened protections for the privacy rights of individuals, including arrestees. Those protections do not vanish merely because someone is arrested. An arrest itself requires probable cause — but such cause, however probable, is a far cry from a conviction. Indeed, the underlying logic of our system of criminal investigation and enforcement is grounded in the distinction between the relatively low-threshold probable cause determination and the onerous burden the government must carry to achieve a criminal conviction. The government may justify a variety of investigative activities without probable cause — from routine patrol of a particular geographic location to following up on tips or information from undercover agents. (E.g., *Kyllo v. United States* (2001) 533 U.S. 27, 31–32 (*Kyllo*) [reiterating the "lawfulness of warrantless visual surveillance of a home"]; *Illinois v. Gates* (1983) 462 U.S. 213, 227, 243 [holding that a tip alone did not supply probable cause but the police follow-up investigation of the tip did].) But when the Act compels the collection of a DNA sample before a determination of probable cause, the government's rationale for seeking DNA samples for all felony arrestees is not sufficiently compelling to outweigh the intrusion on an arrestee's privacy that accompanies the collection

2

and storage of his personal genetic information.  Though the United States Supreme Court may have reached a different conclusion when evaluating another state's DNA collection statute under the federal Constitution, the role of our state charter, the unique importance it assigns to privacy, and the differences between the statute considered in *Maryland v. King* (2013) 569 U.S. 435 (*King*) and the DNA Act involved here all suggest that we should find the implicated provisions of the Act unconstitutional.  So I respectfully dissent.

## I.

What the parties in this case have asked us to decide is whether the DNA Act's provisions requiring collection from all adult felony arrestees violate article I, section 13 of the California Constitution.  So we begin by considering our state Constitution, its relationship to the federal charter, and where the two diverge.

Construing a different statute and a different constitution, the high court in *King* decided that the Fourth Amendment permits — in some instances — collections of DNA from adults arrested for serious crimes.  (*King*, *supra*, 569 U.S. at p. 446.)  Although such a decision merits "respectful consideration" when its analysis is relevant, our own constitution deserves far more than that.  In deciding whether our own state Constitution provides protection against the search or seizure at issue, we are not only free, but obligated, to perform an independent analysis.  (*People v. Teresinski* (1982) 30 Cal.3d 822, 835–836 (*Teresinski*) ["[T]he California courts, in interpreting the Constitution of this state, are not bound by federal precedent construing the parallel federal text. . . .  [T]he state courts, in interpreting constitutional guarantees contained in state constitutions, are *independently responsible* for safeguarding the rights of their citizens." (internal quotation marks omitted)].)  Because of our precedent interpreting the scope of article I, section 13 and the relevance of article I, section 1's explicit protection of

3

privacy, our constitution is more solicitous of the privacy interests of arrestees than the Fourth Amendment.

The California Constitution is not some minor codicil to the United States Constitution. As the majority has no choice but to acknowledge (maj. opn., *ante*, at pp. 30–31), our state Constitution is a document of "independent force," whose meaning is to be independently distilled and propagated by this court, acting in our authority as the state court of last resort. (Cal. Const., art. I, § 24 [making explicit that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution"]; *People v. Brisendine* (1975) 13 Cal.3d 528, 549–550 (*Brisendine*) ["the California Constitution is, and always has been, a document of independent force"]; *People v. Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 (*Longwill*) [stating that "in the area of fundamental civil liberties," "we sit as a court of last resort" and "our first referent is California law and the full panoply of rights Californians have come to expect as their due"].) In cases where the wording of the state constitutional provision at issue parallels a phrase in the federal Constitution, high court opinions on the subject merit respectful consideration. (*Teresinski*, *supra*, 30 Cal.3d at p. 835.) But any such parallels in wording must not occlude our state Constitution's force as the basic charter of government, which is why it is appropriate in some circumstances to take a different course in interpreting our state Constitution. (*Ibid*.)

We have done so in a variety of cases, where we concluded that California's Constitution extends protections to our citizens well beyond those the high court has announced in the federal context. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 353–354 (*Raven*) [listing the "numerous decisions" from this court "interpreting the state Constitution as extending protection to our citizens beyond the limits imposed by the high court under the federal Constitution"]; see also, *Longwill*, *supra*, 14 Cal.3d at pp. 951–952 [holding that our state charter, unlike

4

the federal Constitution, does not allow for carte blanche "full body searches of all individuals subjected to custodial arrest"]; *People v. Maher* (1976) 17 Cal.3d 196, 198–203 [concluding, as in *Longwill*, that "the search of [an arrestee's] person beyond the scope of a pat-down was unlawful under article I, section 13, of the California Constitution"]; *People v. Cook* (1978) 22 Cal.3d 67, 88 [holding that because a Supreme Court's decision "would afford our citizens less protection than is guaranteed to them under California law," it is "not to be followed in California" and that "all challenges to the veracity of a search warrant affidavit in our courts are to be governed by [our own precedent] and article I, section 13, of the California Constitution"]; *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 476 ["the marketing order in question does not implicate any right to freedom of speech under the First Amendment, but does indeed implicate such a right under article I [of our state Constitution]"].)

What's more, within the specific context of search and seizure of arrestees, we have been quite explicit in holding that article I, section 13 provides greater protection than does the Fourth Amendment. (*Brisendine*, *supra*, 13 Cal.3d at pp. 545–546; *Longwill*, *supra*, 14 Cal.3d at p. 951 & fn. 4; *People v. Norman* (1975) 14 Cal.3d 929, 939 (*Norman*); *People v. Ruggles* (1985) 39 Cal.3d 1, 9–11 (*Ruggles*); see also *People v. Laiwa* (1983) 34 Cal.3d 711, 727 (*Laiwa*).) In those cases, we have emphasized that article I, section 13 "requires a more exacting standard" for search and seizure cases arising in this state. (*Brisendine*, *supra*, 13 Cal.3d at p. 545.) We've also rejected the notion — which the United States Supreme Court has embraced — that an individual subject to custodial arrest has significantly diminished expectations of privacy. (*Id.* at p. 547 ["we cannot accept . . . that 'an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person' "].) Even full custodial arrest, booking, and incarceration do not authorize the police to search an arrestee

5

in the hope of discovering evidence of a more serious crime. (See *Laiwa*, *supra*, 34 Cal.3d at pp. 727–728.) What these authorities make clear is as simple as it is important: individuals placed under arrest enjoy greater protection against searches of their persons and things under our state Constitution than under the federal counterpart.

The majority wisely avoids debating such principles. Instead, it seeks to limit relevance of cases like *Brisendine*, *Longwill*, *Norman*, and *Laiwa* by asserting that they all concern "the constitutionality of a [field] search conducted immediately upon arrest," and not, as was the case with petitioner Mark Buza, a search "conducted at *the time of booking*." (See maj. opn., *ante*, at p. 40.) Yet it is far from clear why it should matter that these authorities concern searches done in the field. We have not previously imposed limitations on the scope of the constitutional protections involved that would categorically cleave the rights of individuals subject to searches in the field from those being compelled to provide their DNA at the time of booking. And existing distinctions do not detract from the fact that — in some circumstances — California residents have more robust rights than equivalent ones available under the federal Constitution. (*Brisendine*, *supra*, 13 Cal.3d at pp. 550–551 ["in determining that California citizens are entitled to greater protection under the California Constitution against unreasonable searches and seizures than that required by the United States Constitution, we are embarking on no revolutionary course"].) The question facing us is whether we should extend the same greater protection to our citizens in this situation, not whether we have done that exact thing before.[1]

---

[1] I would also note that the DNA Act authorizes cheek swabs "immediately following arrest" and thus encompasses field searches. (Pen. Code § 296.1, subd. (a)(1)(A).)

6

The majority suggests that we should not do so because the United States Supreme Court decided *King* before we considered the issue. It implies that if the Supreme Court "had not yet decided the parallel question under the Fourth Amendment," then we may be empowered to reach our own conclusions. (Maj. opn., *ante*, at p. 33.) But because *King* predated our consideration, our responsibility shifts from deciding the legality of the search under article I, Section 13 to determining whether "we should reject the high court's Fourth Amendment guidance." (*Id*. at pp. 33–34.)

Nowhere in the majority opinion is there a persuasive justification for why the question is framed in terms of whether we should "reject" the United States Supreme Court's "guidance." Of course we consider United States Supreme Court decisions when they address the scope of a federal constitutional right analogous to a state right, even if we are not required on federal supremacy grounds to adopt the same approach. But unlike the majority, we treat our own precedent as worthy of — at least — "meaningful and careful consideration" as well. (Maj. opn., *ante*, at p. 32, fn. 8.) Our precedent makes clear that even where the relevant provision under our state charter shares "language [in] common" with the federal Constitution, we may interpret our constitution differently than how the high court reads the federal Constitution. (See *Am. Acad. of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 326 (*Lungren*) ["even when the terms of the California Constitution are textually identical to those of the federal Constitution, the proper interpretation of the state constitutional provision is not invariably identical to the federal courts' interpretation of the corresponding provision contained in the federal Constitution"].) What's more, we have said the particular provision at stake here — article I, section 13 — affords arrestees more expansive protection than does the Fourth Amendment. The majority relegates our decisions to the sideline in its rush to adhere to what it calls the high court's "guidance," but in fact, treats as

7

controlling authority. In doing so, the majority fails to maintain fidelity to our caselaw and Constitution.

The position the majority takes is in tension even with its own logic. There is simply no good reason to believe that the order in which this court decides an issue vis-à-vis the high court should determine the outcome of our deliberation, or that we should read our prior cases as supporting some kind of ersatz presumption that we should ration as much as possible the discussion of state constitutional rights. The framing is inconsistent with the majority's purported "reaffirm[ation]" of "long-established principles" that the rights guaranteed by our state Constitution "are in no way 'dependent on those guaranteed by the United States Constitution.' " (Maj. opn., *ante*, at p. 30.) If the rights of our citizens are not dependent on the federal Constitution, then our analytical route for determining what those rights are should not take a different course simply because the United States Supreme Court issued an opinion before we did.

In replying to our criticism, the majority seeks its answer to the awkward question of why temporal order matters so much for its analysis in a rationale that it describes as "straightforward" — so straightforward, in fact, it may be captured in two words: "stare decisis." (Maj. opn., *ante*, at p. 34, fn. 9.) When we have not spoken, says the majority, the weight of stare decisis does not exist to counterbalance against the "force of the contrary United States Supreme Court decision." (*Ibid.*) This contention is doubly flawed. First, by positing that California courts have not spoken, the majority wrongly implies that nothing in our own precedent weighs as much as even a single federal court decision that's not binding on us. Yet as detailed in this section, any reasonable reading of our past decisions reveals them to be enormously relevant to the question before us.

Second, how the majority decides to frame its inquiry is just as much a problem. By asking whether we may grant our own courts a permission slip to

8

"depart" from a United States Supreme Court decision addressing a matter that is no more than partially similar to the case before us, the majority has done more than to adjust the weight on the state side of the jurisprudential scale relative to the federal side. It's dispensing with the scale altogether. Instead of weighing the relative merits of the issue at hand according to our independent responsibility to construe our Constitution, the majority appears to deploy words like "depart" and "guidance" to embrace the view that we should presumptively comply with a United States Supreme Court opinion that does not even address the precise question before us. In this new analysis, our own authorities are emaciated in importance by being read narrowly, such that booking searches are presumed to be so categorically distinct from field searches that nothing meaningful can be gleaned for this case from decisions involving the latter. Meanwhile, a far-broader reading and presumption of validity is reserved for a non-binding United States Supreme Court decision — even though the decision is interpreting a different Constitution, and a different DNA collection scheme that does not come close to applying to all felony arrestees. This position implies that the United States Supreme Court can dictate what we do whenever we interpret an issue under the California Constitution, despite our prior decisions supporting a contrary answer, so long as we have not previously resolved precisely the same question. Remarkably, this position removes both the "stare" and "decisis" from "stare decisis" — inverting the concept to justify departures from California decisions governing the scope of state privacy protection.

Those decisions underscore how adopting *King*'s approach would be at odds with article I, section 1 of California's Constitution. And it would be at odds with our case law construing that provision and emphasizing the importance of informational and dignitary privacy interests under California law. In contrast to its federal counterpart, the California Constitution contains an express statement

9

about the importance of personal privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I § 1.) True: we have previously found that article I, section 1 does not by itself confer a privacy right substantively different from what article I, section 13 purports to protect. (*People v. Crowson* (1983) 33 Cal.3d 623, 629.) But neither have we held that this language is devoid of meaning when considered together with that of article I, section 13.

The reason we have not so held is because the most sensible reading of the California Constitution would assign both importance and meaning to its mention of personal privacy. Even if the language in article I does not create a separate class of privacy rights, at a minimum this reference underscores how certain infringements of personal privacy deserve heightened scrutiny in our search and seizure analysis relative to what the federal analysis requires. Our cases construing article I, section 1 in relation to the federal Constitution reinforce this conclusion. What we have emphasized is that the scope of the state constitutional right of privacy is broader than the concept of privacy the federal courts have identified — and that this distinction may at times lead us to provide greater protection for individuals' privacy rights than the federal courts might. (*Lungren*, *supra*, 16 Cal.4th at pp. 326–327 ["past California cases establish that, in many contexts, the scope and application of the state constitutional right of privacy is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts"].)

Our cases have described the "core value" of article I, section 1 as protecting so-called "informational privacy," meaning the privacy interest in sensitive and confidential personal information. (*Hill v. National Collegiate*

10

*Athletic Assn.* (1994) 7 Cal.4th 1, 35–36 (*Hill*); *Lungren*, *supra*, 16 Cal.4th at p. 406.)  We have found that article I, section 1 grew out of the electorate's fears of "increased surveillance and data collection activity in contemporary society" (*White*, *supra*, 13 Cal.3d at p. 774), and was intended to address the potential collection, stockpiling, and use of individuals' most personal information in an arbitrary and unjustified fashion.  (Ballot Pamp., Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11, p. 27 (Article I, section 1 Ballot Pamp.) [privacy initiative targeted the "collecting and stockpiling [of] unnecessary information . . . and misusing information gathered for one purpose in order to serve other purposes or to embarrass"].)  Article I, section 1 provides special protection for what we have deemed "autonomy," or dignitary, privacy, which we have described as protecting the interest in making "personal decisions or conducting personal activities without observation, intrusion, or interference." (*Hill*, *supra*, 7 Cal.4th at p. 35.)  We have found dignitary privacy to embrace a person's interest in retaining control over his or her own body and "bodily integrity." (*Lungren*, *supra*, 16 Cal.4th at pp. 326–327, 337.)  Finally, it has not escaped our attention that article I, section 1 addresses the unique harms that can occur when the government intrudes on a person's privacy.  The proponents of the provision warned of the possibility of the government assembling "personal information" and referred specifically to the possibility that private information could be permanently stored in government records.  (Article I, section 1 Ballot Pamp., *supra*, at p. 26 ["Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens.  Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American."].)

Given the nature of these concerns, the machinery of the DNA Act appears to epitomize the sort of intrusion relevant under article I, section 1.  The collection of DNA — whether it is via cheek swab or any of the other collection processes

11

the Act permits (see Pen. Code, § 298.1, subd. (b) [permitting the use of reasonable force to collect DNA database samples]) — violates the subject's bodily integrity. (See *Hill*, *supra*, 7 Cal.4th at pp. 40–41 [finding that the collection of a urine sample "impacts legally protected privacy interests"].) And the use of that sample to create and store a DNA profile gives the government long-term access to the subject's genetic code — some of the most personal information imaginable. (*Id.* at p. 41 [" 'A person's medical profile [as revealed by the collection and analysis of urine] is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected.' "]; *Birchfield v. North Dakota* (2016) 579 U.S. ___, ___–___ [136 S.Ct. 2160, 2177] (*Birchfield*) [noting that DNA collection and analysis "put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained"].) The DNA Act's processes thus seem to fall close to the heart of article I, section 1's scope. Consequently, it is vital to consider article I, section 1 in our independent analysis of the constitutionality of the DNA Act under our state charter.

Ultimately, the majority's approach to constitutional federalism fails to do justice to the importance of state constitutional rights. The majority does not appear to reject the well-settled principle that "[t]he construction of a provision of the California Constitution remains a matter of California law regardless of the narrower manner in which decisions of the United States Supreme Court may interpret provisions of the federal Constitution." (*People v. Pettingill* (1978) 21 Cal.3d 231, 247–248.) Yet it ironically finds that neither our constitution nor case law offers "adequate reasons" for us to take a fresh look at this case beyond what it takes to be the long shadow cast by *King*. (Maj. opn., *ante*, at p. 34.)

12

The path we are bound to follow is a different one.  Instead of relying primarily on *King* to yield a tidy solution in this case, we owe it to the citizens of our state to perform an independent analysis to determine whether " 'the particular governmental invasion of a citizen's personal security' " is reasonable under the circumstances of this case.  (*In re Tony C.* (1978) 21 Cal.3d 888, 892.)  Our analysis shows the intrusion to be unreasonable.

**II.**

Once we assign proper weight and meaning to the California Constitution, we can turn to the ultimate question in any case arising under article I, section 13: whether the search or seizure in question is reasonable.  (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1329 (*Ingersoll*); see also *Brisendine*, *supra*, 13 Cal.3d at p. 536.)  At issue here is the compelled physical production of a biological sample from someone who has not been convicted.  Whether this particular search satisfies the reasonableness standard is judged by balancing its intrusion on the individual's reasonable expectations of privacy against its promotion of legitimate government interests.  (*People v. Robinson* (2010) 47 Cal.4th 1104, 1120 (*Robinson*).)  In this section, we examine the interests the government says are served by the DNA Act.  Ultimately, such interests either ring hollow or prove insufficient to justify suspicionless, warrantless searches of the type allowed by the Act.

As a threshold matter, it is questionable whether the DNA Act genuinely furthers many of the interests the government identifies.  The government must create a DNA profile and compare it against existing profiles to obtain any of the "identification" information it needs.  The State informs us here that it takes "around 30 days on average" to generate an identification profile from an arrestee's DNA sample.  Yet in seeking to justify the collection of DNA, the government points to functions — verifying identity, making bail decisions, and

13

so forth — that it must perform near to the time an arrestee is booked and processed into jail, or shortly thereafter. In fact, the Attorney General acknowledges that "in many cases" an arrestee is released from custody before the State obtains his or her DNA profile. So, it seems unlikely that DNA collection actually furthers any of these identification interests; the government even acknowledges that it uses *fingerprints*, not DNA, to aid most of these decisions and that fingerprinting "plays the lead role in confirming who a person is." Law enforcement officials are able to collect fingerprints promptly, compare them against an electronic database composed of prints from various sources — including former arrestees but also civil sources such as persons who have served or are serving in the United States military, or have been or are employed by the federal government — and obtain a response as to any "hits" within approximately 27 minutes. (FBI, Integrated Automated Fingerprint Identification System archived at <https://web.archive.org/web/20120921125141/http://www.fbi.gov/about-us/cjis/fingerprints_biometrics/iafis/iafis/> [as of Apr. 2, 2018].) In short, it seems that DNA collection does little to meaningfully further the State's asserted interests in establishing an arrestee's identity and making various intake and processing decisions.

The majority acknowledges that there may be a delay of "weeks or months" between the initial booking and when a DNA profile is generated. (Maj. opn., *ante*, at pp. 36–37.) Nonetheless, it asserts that governmental interest in identifying arrestees is unaffected because information from an DNA profile — late as it may be in coming in — can still "influence the jailer's decision about where to house the arrestee," or lead to a "revisit [of] an initial determination to release the arrestee" or "impos[ition] [of] new release conditions." (*Id.* at p. 36.) The government did not advance interests so far removed from the time of

14

booking in its own briefs. Tellingly, the majority has cited no source to suggest that jails have the capacity to rehouse felony arrestees — those arrested for "serious or violent" crimes (*id.* at p. 17) — in more secured places simply because they are now suspected of a second crime, as revealed by a "hit" against their DNA profile. We also question the premise that a reassessment of the initial release decision is in itself a compelling governmental interest, especially when we have little idea — as neither the government nor the majority has told us — how often such a circumstance presents itself. We are asked to tip the scale in favor of the government without knowing how many felony arrestees are released; released with less than a full set of conditions imposed; or face a revisit of the initial release determination when their DNA generates a hit (as opposed to an arrest on the new crime). To expect that we would simply look past this absence of justification is to take the idea of a blindfold on the judicial process far too literally. (See *Riley*, *supra*, 134 S.Ct. at p. 2485 [finding an asserted government interest inadequate when "neither the United States nor California offers evidence to suggest that their concerns are based on actual experience"].)

Instead of the supposed interests tied to the initial arrest and booking, the most plausible justification for the present DNA collection is that it aids in identifying arrestees who may have been perpetrators of unsolved crimes. Proposition 69 was titled the "DNA Fingerprint, Unsolved Crime and Innocence Protection Act." Ballot arguments in favor of the initiative relied heavily on the promise that DNA collection would increase the likelihood of solving cold cases and help police investigations. (See Ballot Pamp., Gen. Elec. (Nov. 2, 2004) argument in favor of Prop. 69.) For instance, those arguments referenced a number of murders that had been solved based in part on DNA evidence and promised that the DNA Act would help "solve crime, free those wrongfully accused, and stop serial killers." (Ballot Pamp., Gen. Elec. (Nov. 2, 2004) text of

15

Prop. 69, p. 62.) Likewise, the findings section of the proposed law declared that it would "solve crime[s]," "apprehend perpetrators," expand the number of "cold hits and criminal investigation links," and thereby "substantially reduce the number of unsolved crimes." (*Id.* at p. 135.)

The Attorney General's arguments in defense of the DNA Act suffer essentially the same malady. Most of the government's justifications for the DNA Act that the Attorney General emphasizes — even those couched in terms of "identity" — pivot on generalized concerns about crime-solving. For instance, the Attorney General argues that since the DNA Act was enacted, the State has recorded more than 31,000 "hits" between identification profiles taken from arrestees and DNA stored from unsolved cases. The government argues that DNA identification yields "substantial benefits" for law enforcement, and illustrates the point by referencing cold cases that were solved after many years when DNA evidence was collected and linked to the unsolved matter. The government also argues that the "benefits" from the DNA Act include deterrence, insofar as a potential criminal is aware that the Act enhances law enforcement's capacity to identify the perpetrators of crimes and prosecute them.

Crime-solving through identification of such perpetrators can certainly constitute a legitimate government interest. (See *Robinson*, *supra*, 47 Cal.4th at pp. 1121–1122.) At issue here is not whether the government can have a legitimate interest in solving crimes, but whether such a generalized interest — without more — is sufficient to overcome the privacy rights of individuals subject to arrest. We have made clear that where the primary purpose of a search or seizure is to detect crime or gather evidence of crime, the government must ordinarily have individualized suspicion that the person to be searched has committed a specific offense for the search or seizure to be valid. (See *Ingersoll*, *supra*, 43 Cal.3d at pp. 1327–1328.) Such individualized suspicion is utterly

16

missing when the government searches all arrestees for evidence that, at some unknown time in some unknown place under unknown circumstances, they might have committed some other unidentified crime.

The risk in simply embracing generalized crime-solving as sufficient justification for compelled collection of a DNA sample from someone who has merely been arrested is that such a move may be understood to justify searches and seizures of people and places without any particularized suspicion. The detection of legal wrongdoing is perhaps the preeminent justification for all policing activity, making such a generalized interest virtually always loom in the background when any law enforcement search is attempted. To allow such an interest to tip the balance and allow for, first, an intrusion into the body; second, analysis of the information seized therefrom; and, finally, potentially indefinite retention of the results (regardless of the outcome of the initial arrest that served as justification for the search), is to permit such an interest to become not only omnipresent but also omnipotent. Having trumped a person's interest in what is often the most jealously guarded fount of information — and having done so on the basis of nothing more than that the mere fact a person was subject to a felony arrest — the diffuse governmental interest in generalized crime-solving will almost always overwhelm any offsetting consideration. Which is why we must be especially vigilant before embracing the government's argument. (See *King*, *supra*, 569 U.S. at p. 482 (dis. opn of Scalia, J.) [acknowledging that "the construction of [] a genetic panopticon," culled from "the taking of DNA samples from anyone who flies on an airplane," "applies for a driver's license," or "attends a public school" would have the "beneficial effect of solving more crimes" but denouncing the idea that this was enough to override "the charter of our liberties"].)

17

So it is beyond question that the government may deploy reasonable techniques to solve crime — so long as those techniques do not effect a search or a seizure without individualized suspicion. Yet the fact that the class of persons subject to the DNA Act is limited to arrestees, rather than all citizens, does not give rise to the necessary threshold of suspicion to conduct a generalized search for incriminating information, nor does it change the usual presumption that searches are unlawful absent a warrant. Moreover, the warrant exception for a search incident to arrest is limited. It allows only for searches to uncover evidence of the crime that gave rise to the arrest itself or weapons that might be used to injure an arresting officer or accomplish an escape. (*Brisendine*, *supra*, 13 Cal.3d at p. 539.) We made this rule clear in *Brisendine*, and have continued to adhere to it in subsequent cases, where we have refused to allow the fact of arrest to justify the warrantless search of arrestees, or their property, for items not related to one of these two governmental interests. (See *Ruggles, supra*, 39 Cal.3d at pp. 11–12 [finding search of containers in trunk of felony arrestee's car unconstitutional]; *Laiwa*, *supra*, 34 Cal.3d at pp. 727–728 [finding search of individual's tote bag following arrest unconstitutional].)

Under this authority, even full custodial arrest, booking, and incarceration will not authorize law enforcement to conduct an exploratory search of an arrestee in the hope of discovering evidence of another, possibly more serious crime. (See *Laiwa*, *supra*, 34 Cal.3d at pp. 727–728.) Rather, booking an arrestee into custody only permits a further search necessary to serve the government's administrative needs. (*Id.* at p. 726; *People v. Macabeo* (2016) 1 Cal.5th 1206, 1214.) In contrast to such searches, the DNA collection at issue would effect a search and seizure to uncover evidence of any and all illicit activities — those committed in the past as well as those that might be committed in the future, none of which the State has justifiable reason to suspect that the arrestee has done. To allow such an

18

intrusion would contravene our precedent and dramatically expand the recognized exceptions to the warrant requirement.

It is true that DNA sampling will "provide accurate and reliable identification of criminal offenders" and that "DNA samples, like fingerprints, may also be used to establish a suspect's involvement in crimes." (Maj. opn., *ante*, at p. 35.) What does not follow from this observation is that the constitutionality of fingerprinting renders DNA sampling constitutional. To treat fingerprints and DNA samples as essentially similar is akin to comparing a single piece of fruit to a chain of supermarkets. Neither we, nor the high court, have ever held that the taking of fingerprints, photographs, or the like invades any expectation of privacy, or otherwise heightens the risks that bring article I, section 13 or the Fourth Amendment into play.[2] To the contrary, we have indicated that the taking of fingerprints is "standard police procedure," rather than a search or seizure of an arrestee's person. (*People v. McInnis* (1972) 6 Cal.3d 821, 825–826; see also *Loder v. Municipal Court* (1976) 17 Cal.3d 859, 865 (*Loder*).)[3]

---

[2]　　None of the cases the Attorney General cites is to the contrary. The Attorney General cites *United States v. Mitchell* (3d Cir. 2011) 652 F.3d 387, 411, for the proposition that the collecting of fingerprints has met with "universal approbation" from the courts. But in *Mitchell*, the court embraced the DNA-fingerprinting analogy in addressing a challenge to the federal DNA collection statute; the court did not consider a Fourth Amendment challenge to the practice of fingerprinting. The same is true of *Doe v. Sheriff of DuPage County* (7th Cir. 1997) 128 F.3d 586, which did not consider a Fourth Amendment challenge to fingerprinting but instead addressed a defendant's argument that the sheriff should have permitted persons surrendering on warrants to post bond without being taken into custody. (*Id.* at p. 588.)

[3]　　*United States v. Kelly* (2d Cir. 1932) 55 F.3d 67, 69, which the majority relies on here (maj. opn., *ante*, at pp. 36–37), likewise demonstrates only that fingerprinting is a commonplace means of identification — not that it is, like DNA collection, a search that implicates an individual's constitutional rights.

Rather than finding these police processes to constitute reasonable invasions of an arrestee's privacy, our precedent instead concludes that the taking of fingerprints or photographs does not implicate article I, section 13 at all. (See *Loder*, *supra*, at pp. 864–865 [arrestee's right of privacy is not infringed by the taking of his fingerprints and photographs, or recording of his vital statistics].) The high court, likewise, has suggested that fingerprinting — and similar recordings of bodily characteristics that do not require an "intrusion into the body" — does not come within the Fourth Amendment's scope. (See *United States v. Dionisio* (1973) 410 U.S. 1, 14–15; see also *Davis v. Mississippi* (1969) 394 U.S. 721, 727 [concluding that fingerprinting "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search"].) In contrast to the collection of DNA, fingerprinting does not intrude on a person's bodily autonomy, or record information that is not otherwise available to public view (like the image of one's face or markings on a person's body). (Cf. *Robinson, supra,* 47 Cal.4th at pp. 1119–1120 [characterizing intrusions necessary for DNA profiling as "invasions of the body" constituting searches within the meaning of the Fourth Amendment].) All this makes it difficult to accept the majority's argument that DNA collection is tantamount to fingerprinting and therefore necessarily constitutional. (See *State v. Medina* (2014) 102 A.3d 661, 682–683 [rejecting comparison of DNA collection to fingerprinting in holding Vermont's DNA collection statute unlawful under Vermont Constitution's prohibition against unreasonable searches and seizures].)

A recent United States Supreme Court decision also cuts against treating fingerprinting and DNA collection as equivalent. In *Birchfield*, *supra*, 136 S.Ct. at p. 2185, the high court held that the search incident to arrest doctrine does not justify the warrantless taking of a blood sample to measure blood alcohol content

(BAC). To reach this conclusion, the high court weighed the privacy interests affected by blood tests against the government's need for such tests. It found that the tests implicated significant privacy concerns — not only because of the intrusive nature of the tests, which involve piercing the skin, but also because a blood sample contains sensitive information which may be susceptible to substantial further analysis. (*Id.* at p. 2178.) The court noted that a blood test "places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading." (*Ibid.*) As such, "[e]ven if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested." (*Ibid.*) In contrast, "breath tests are capable of revealing only one bit of information, the amount of alcohol in the subject's breath." (*Id.* at p. 2177.)

Breath tests are like fingerprints, and DNA samples, like blood. Fingerprints reveal only limited bytes of information. Not so with DNA. DNA samples contain a wealth of genetic information, which would make an individual nervous about possible violations of his or her privacy as long as the information remains in the state's possession. The Supreme Court had no trouble distinguishing between breath and blood tests, finding one constitutional and the other not. We likewise would do well not to ignore the distinction between DNA analysis and fingerprinting.

Nor should we ignore that fingerprinting remains available to advance many of the very interests that allegedly support the DNA Act. The existence of fingerprints as a fast and accurate means to ascertain the identity of an arrestee

21

further diminishes the state's interest in identifying individuals by their DNA. Undoubtedly there are some instances where a DNA sample may help to solve a cold case but a set of fingerprints would not. (See maj. opn., *ante*, at p. 37 [identifying *Robinson* as one such case].) Nonetheless, just as the "reasonableness [of blood tests] must be judged in light of the availability of the less invasive alternative of a breath test" (*Birchfield*, *supra*, 136 S.Ct. at p. 2184), DNA tests must be judged in light of the availability of the less invasive alternative of fingerprints — even if the alternative is not a perfect substitute. The high court in *Birchfield* recognized various advantages that a blood test offers over a breath test (*id.* at pp. 2184–2185), and yet did not find that enough for the former to pass constitutional muster. Instead, because "breath tests are significantly less intrusive than blood tests and *in most cases* amply serve law enforcement interests," the court concluded that there was no sufficiently compelling justification for warrantless blood tests. (*Id.* at p. 2185, italics added.) The same conclusion follows with the DNA tests at issue here.

### III.

Even as the DNA Act falls short of legitimately advancing the interests the government asserts, its requirements constitute a major intrusion into the privacy of all the people subject to its procedures. Focusing solely on the physical collection of DNA samples understates the invasion at issue in this case. The DNA Act is unusual in that it effects more than one intrusion into a person's privacy and autonomy: the intrusion occurs not only when the arrestee is physically subjected to the DNA collection, but also when his biological sample is processed to create a DNA profile, stored indefinitely in federal and state databases, and potentially analyzed in the future when conducting comparisons

22

against newly obtained samples. This continuing intrusion makes the DNA Act's search unlike other ordinary searches and seizures, as the potential infringement on an individual's privacy is ongoing.

The second intrusion — the processing, storage, and comparison of an individual's DNA sample — is a far more significant invasion of an arrestee's privacy. That one's DNA reveals much of a person's most private, closely guarded information is difficult to dispute. A DNA sample stored by the state contains an arrestee's entire genetic code — information that has the capacity to reveal the individual's race, biological sex, ethnic background, familial relationships, behavioral characteristics, health status, genetic diseases, pre-disposition to certain traits, and even the propensity to engage in violent or criminal behavior. (See *United States v. Kriesel* (9th Cir. 2013) 720 F.3d 1137, 1149, 1159–1160 [citing Krimsky & Simoncelli, Genetic Justice (2010) at pp. 231–232]; see also Abrams & Garrett, *DNA and Distrust* (2016) 91 Notre Dame L.Rev. 757, 763.) The DNA profile maintained in state and federal databases thus has the potential to reveal vast amounts of personal information about those individuals, and to be used in ways starkly different relative to what justified the scheme. (Krent, *Of Diaries and Data Banks: Use Restrictions Under the Fourth Amendment* (1995) 74 Tex. L.Rev. 49, 95–96.) One can scarcely imagine personal information that falls more closely to the core of the "realm of guaranteed privacy" that constitutional protections against searches and seizures aim to protect. (*Kyllo*, *supra*, 533 U.S. at p. 34; see also *Ruggles*, *supra*, 39 Cal.3d at pp. 9–10 [article I, section 13 considers whether a search interferes with a person's reasonable expectations of privacy]; *United States v. Amerson* (2d Cir. 2007) 483 F.3d 73, 85 [describing the "vast amount of sensitive information that can be mined from a person's DNA"].)

Given the extent of the interests involved, it should not be taken for granted that the State's current practices or statutory provisions prohibiting misuse will mitigate the interference with an arrestee's expectation of privacy. (Cf. maj. opn., *ante*, at p. 38.) For one, it is not necessarily the actual use of an individual's DNA that invades her reasonable expectations of privacy. (See *Birchfield*, *supra*, 136 S.Ct. at p. 2178 ["Even if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested."].) Here, a privacy intrusion occurs from the mere fact of the government's storage of an arrestee's DNA, regardless of the way that the government uses it. That the government retains access to a person's most private, sensitive genetic information — and the risks implicit in such access — constitutes a violation in itself, even if the government does not presently wring from the DNA all the flows of information to be found there. (*Ibid.*; see also *United States v. Jones*, 565 U.S. 400, 415–416 (conc. opn. of Sotomayor, J.) [finding continuous GPS monitoring to be an unconstitutional search in part because of the risk that the government "[could] store such records and efficiently mine them for information years into the future"].)

Moreover, it is precisely this kind of intrusion that justifies California's heightened privacy protections in the first place. As discussed above, the purpose of the constitutional grant of privacy is to protect citizens from governmental surveillance and other forms of information gathering. The DNA Act permits the government to store DNA with the potential to reveal information of an indisputably private nature. Article I, section 13 of our state Constitution — as informed by the privacy clause of article I, section 1 — protects against such an invasion of core privacy. (See *Ruggles*, *supra*, 39 Cal.3d at pp. 9–10.)

Furthermore, that the DNA Act invades the privacy of *arrestees* in particular does not mean we can ignore the resulting privacy invasion — or the

24

risks associated with it. We have rejected the premise that an individual placed under arrest — even custodial arrest — lacks a significant, constitutionally protected interest in the privacy of her person. We have done so for good reason: valid justification to arrest an individual for a specific offense does not consequently extinguish all of her privacy rights, nor does it imply — without more — that there is a basis to suspect her of involvement in any other kind of felony. (*Brisendine, supra*, 13 Cal.3d at p. 556.) In contrast, *convicted felons* " 'retain no constitutional privacy interest against their correct identification.' " (*Robinson*, *supra*, 47 Cal.4th at p. 1121.) But we have never held, as the government argues, that individuals lawfully placed under custodial arrest lack a constitutionally protected interest in their genetic identity.

Nor can we consider the privacy interests at stake in this case solely from the perspective of an individual who has been lawfully arrested and convicted. It is undisputed that Buza was arrested with probable cause and convicted of three felonies. But Buza declined to provide a sample of his DNA during his booking into jail — long before his felony convictions, and prior to a probable cause determination by a neutral magistrate. Whatever is the basis for a felony arrest, the arrestee may not be subjected to a presumption of guilt until proven innocent. At the time of refusal, Buza enjoyed the presumption of innocence, and the ultimate disposition of his felony charges was uncertain. At that moment, Buza had just as much a right to assert noncompliance in order to raise a challenge against the DNA Act as an arrestee who would eventually be acquitted of felony charges. Far from asserting the privacy interests of third parties, Buza challenges the DNA Act as it applies to himself under the circumstances of this case. (Cf. *Sabri v. United States* (2004) 541 U.S. 600, 609 [disapproving of a facial challenge to the constitutionality of a statute]; *In re Cregler* (1961) 56 Cal.2d 308,

25

313 ["one will not be heard to attack a statute on grounds that are not shown to be applicable to himself"].)

Suppose we waited instead for another case brought by a plaintiff lawfully arrested for, and ultimately acquitted of, a felony charge. When this hypothetical plaintiff is told to submit to a DNA test upon arrest, she is presented with only two choices, both causing irreparable harm: (1) she could refuse the test and be lawfully prosecuted for (and found guilty of) a misdemeanor; or (2) she could submit to the test, and suffer the very harm to her privacy that she would later attempt to mitigate partially by seeking expungement. We may on occasion tolerate some degree of privacy harm and still uphold a search and seizure as reasonable. (See, e.g., *People v. Medina* (1972) 7 Cal.3d 30, 40 ["Reasonableness of a search may depend on the *degree* of invasion of privacy which occurs." (italics added)].) But this case raises more serious privacy concerns, because of the character of the information the government seeks to obtain. (See *Birchfield*, *supra*, 136 S.Ct. at p. 2178; *State v. Medina*, *supra*, 102 A.3d at p. 682 [stating that it is "important to note that the DNA samples being seized provide a massive amount of unique, private information about a person that goes beyond identification" in finding unconstitutional a state statutory amendment which had permitted DNA collection from all felony arraignees].) By declining to reach the issue here, we force a potential future plaintiff to suffer irreversible adverse consequences, either by penal sanction or harm to genetic informational privacy. This seems a substantial burden to impose upon an individual seeking to challenge the infirmities of the retention provisions, particularly where, based on the facts of *this* case, the majority already implicitly recognizes that there are likely constitutional defects in the statutory provisions regarding the government's retention of genetic information. (Maj. opn., *ante*, at p. 25 [stating that "we must

26

leave for another day" the question of whether automatic expungement is constitutionally required for "the wrongly arrested or exonerated"].)

That Buza was ultimately arraigned and convicted is therefore irrelevant to our analysis. (Cf. maj. opn., *ante*, at pp. 2, 41–44.) We must consider Buza's claim in light of how he was situated when that claim accrued — when he was merely "[a]n arrestee whose arrest has not even been subjected to a judicial determination of probable cause," and so held privacy interests "closest on the spectrum of privacy rights to an ordinary citizen." (*People v. Buza* (2014) 231 Cal.App.4th 1446, 1488; see *People v. Triggs* (1973) 8 Cal.3d 884, 893 (*Triggs*) ["In seeking to honor reasonable expectations of privacy through our application of search and seizure law, we must consider the expectations of the innocent as well as the guilty."].) The majority makes much of the fact that Buza made incriminating statements when he was arrested, which it takes to mean that he knew his arrest was supported by probable cause. (Maj. opn, *ante*, at pp. 20 & fn. 4, 42.) Why exactly an individual arrestee's subjective belief about probable cause should factor into the analysis is far from clear, particularly since we consider probable cause objectively, from the point of view of a reasonable person in possession of all the facts known to the arresting officer. (E.g., *Wren v. United States* (1996) 517 U.S. 806, 812–813.) Moreover, simply because Buza knew the authorities were "going to regard [his setting fire to a police car] as an illegal act" does not mean that he forfeited all reasonable expectations of privacy. Irrespective of Buza's state of mind when he was arrested, his refusal to allow collection of his DNA sample at booking spoke volumes in manifesting his subjective expectation of privacy. The question facing us here is whether that expectation is reasonable. Because of the veil of ignorance that prevents society from knowing for certain whether an arrested individual is in fact guilty of the offense that is the basis for the arrest, Buza was in every meaningful respect

27

indistinguishable from an arrestee who is later found to be innocent. So we explore the reasonableness of Buza's privacy expectation from that perspective.

Unlike the Maryland statute scrutinized in *King*, the DNA Act does not require that a *lawful* arrest have occurred before DNA collection, as it permits the retrieval and processing of a DNA sample before a magistrate or other judicial officer has determined that the arrest was supported by sufficient probable cause. This aspect of the DNA Act vastly expands the number of individuals subject to its dragnet. As Justice Liu points out, almost one in five felony arrestees are released prior to a judicial determination of probable cause. Yet all of these individuals must allow their DNA to be collected and retained by the state (for at least 180 days) under threat of criminal sanction. (Pen. Code, § 299, subd. (c)(2)(D).) Even more invidiously, the fact that the state may compel a DNA sample from even those wrongfully arrested provides the perverse incentive for law enforcement to engage in pretextual arrests as a means to obtain a person's DNA and wherefore uncover evidence of crimes.

The DNA Act's lack of an automatic expungement provision exacerbates such concerns. Again, unlike the Maryland statute, the Act does not require the destruction of the DNA sample and removal of any resulting profile from state and federal databases if the individual at issue is never convicted of a felony. Instead, the DNA Act requires a discharged arrestee to initiate expungement proceedings and navigate the resulting process himself. Although the Department of Justice assures us that the "vast majority of requests have resulted in expungement," the Attorney General does not provide — and the record does not elsewhere contain — any information about how often eligible individuals initiate expungement proceedings in the first place. The absence of automatic expungement proceedings, and the employment of a process that requires the arrestee to initiate expungement and provide required documentation, heightens the possibility that

28

the State will retain possession of DNA profiles for individuals who were never convicted of qualifying felonies, who may never have been charged with a felony in the first place, or who may not have been lawfully arrested at all.

Ironically, the interests advanced by the Attorney General on behalf of the state — i.e., generalized crime solving, proper housing of arrestees within the jails, and decision-making about pretrial release — are likely to be quite well-served even if the statutory scheme avoided its present constitutional defects. Indeed, the concerns about inadequate expungement measures and pretextual or abusive arrests could be alleviated by provisional amendments to the DNA Act already enacted by the Legislature. Under the version of the Act that will become operative if we affirm the appellate court, a jail official is not to transmit a DNA sample to the Department of Justice until there has been a felony arrest warrant signed by a magistrate, a grand jury indictment issued, or a judicial determination of probable cause for the arrest. (Pen. Code, § 298, subd. (a)(1)(A).) Waiting for a neutral determination of probable cause would add, at most, 48 hours to the 30 days needed on average to process a DNA sample. (See *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56.) In view of the delays already associated with DNA processing, postponing the process until a detached and neutral magistrate has found probable cause would diminish none of the state's interests furthered by the DNA Act, since the state would be as able to "identify" arrestees after a 32-day waiting period as it would after a 30-day period. The amendment, however, would significantly cut down on the number of people whose privacy is invaded due to the analysis, storage, and comparison of their DNA samples.

Nowhere does the majority seem to reject the merits of that approach. (See maj. opn., *ante*, at pp. 21–22.) Instead, it argues that since DNA processing is so slow, processing of the arrestees' samples in practice — regardless of what the law permits — usually does not take place until judicial probable cause has been made

29

anyway.  (*Id.* at p. 22.)  The slow operation of existing technology and institutional practices thus become features supporting the constitutionality of the Act.  As odd as this argument is, its force is sapped further still by the Act's blanket permission for the processing of DNA samples even if a magistrate finds that the arrest was without probable cause.  (See Pen. Code, § 298 [requiring jail officials to "promptly" forward biological samples to the Department of Justice without providing any exception for those wrongfully arrested].)  The burden remains on the individual — even if wrongfully arrested or later exonerated — to seek expungement.  But were we to strike down the Act, automatic expungement would become law.  (See Pen. Code, § 299 [conditional provision to the Act requiring automatic expungement of DNA profiles from databank when the arrests do not lead to valid convictions].)  In contrast, the existing statute creates a default regime that requires DNA samples from anyone subject to a felony arrest — irrespective of whether they will eventually be judged guilty or whether a neutral magistrate finds probable cause — and leaves the state in a position to retain such information indefinitely unless expungement is pursued and achieved.

None of these observations implies we should strike down the DNA Act because we prefer its replacement on policy or prudential grounds.  (Cf. maj. opn., *ante*, at p. 29, fn. 7.)  Instead we emphasize what remains obvious even if downplayed by the majority:  the Legislature has approved a law that accomplishes much of the Government's interests while alleviating the constitutional problem.

While the DNA Act is an initiative entitled to a presumption of validity, the searches it permits — and in fact, requires law enforcement to carry out — occur without a warrant or probable cause.  If those searches are to be upheld, it is the State's burden to persuade us that they fall within one of the recognized exceptions to the warrant requirement, or that they are otherwise reasonable.

30

While "mere doubt" about the DNA Act's invalidity is not reason enough to strike it down (*Calfarm Insurance Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 (*Calfarm*)), we must nevertheless require the State to justify the searches the Act accomplishes.  In this case, the State has not carried its burden to show the reasonableness of its searches when balanced against the interference with individual privacy.  So provisions of the DNA Act authorizing such unreasonable searches must be struck down.

Insofar as the majority would lean on majoritarian impulses to imply that something more is required because the Act is an initiative passed by voters (see maj. opn., *ante*, at pp. 22–23, 34, 44), we note that there is no formal distinction in our role in evaluating initiatives versus legislation enacted by representative political institutions.  (*Calfarm*, *supra*, 48 Cal.3d at pp. 814–815 [evaluating an initiative " 'in the light of established constitutional standards' " and finding it unconstitutional].)  The Constitution applies both, and equally, to legislators and the general public. The majority cannot mean to suggest otherwise.

In the final analysis, arrestees do not have such diminished expectation of privacy as to permit the State to retain their DNA profile and conduct repeated searches of it.  As such, when weighed against the State's generalized interest in identifying arrestees and solving crimes, an arrestee's reasonable privacy interest in his or her genetic information — uniquely protected under the California Constitution — must win. (*Triggs*, *supra,* 8 Cal.3d at p. 892 [" 'important as efficient law enforcement may be, it is more important that the right of privacy guaranteed by these constitutional provisions be respected' "].)

## IV.

The DNA Act unlawfully invades people's reasonable expectation of privacy in their personal genetic information. Any diminished expectation of privacy arrestees may or may not have in their genetic code does not justify an intrusion of this magnitude. The government's asserted interest in identifying individuals in its custody and solving crimes may prove important in justifying a variety of practices. But it does not countenance this intrusion, as the government's rationale for the DNA Act is neither borne out by the Act's implementation nor consistent with our precedent's restrictions on suspicionless searches. This makes the DNA Act unconstitutional under our state charter as applied to felony arrestees — individuals, like Buza, who are not yet known to be lawfully arrested, much less found guilty. Far from invalidating the work of the California electorate, striking down the Act would vindicate our core constitutional values, which recognize that our citizens have the "inalienable rights" to be free of arbitrary governmental intrusion and to enjoy "safety, happiness, and privacy." (Cal. Const., art. I, §§ 1, 13.)

With respect, I dissent.

**CUÉLLAR, J.**

**WE CONCUR:**

**LIU, J.**
**PERLUSS, J.**\*

---

\*      Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Buza
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 231 Cal.App.4th 1446
**Rehearing Granted**

_____

**Opinion No.** S223698
**Date Filed:** April 2, 2018
_____

**Court:** Superior
**County:** San Francisco
**Judge:** Carol Yaggy

_____

**Counsel:**

J. Bradley O'Connell and Kathryn Seligman, under appointments by the Supreme Court; and Janice Wellborn, under appointment by the Court of Appeal, for Defendant and Appellant.

Michael T. Risher; Joseph R. Grodin; Paul Hastings, Peter C. Meier, Eric A. Long and Jamie L. Williams for American Civil Liberties Union Foundation of Northern California as Amicus Curiae on behalf of Defendant and Appellant.

Hanni Fakhoury, Jennifer Lynch and Lee Tien for Electronic Frontier Foundation as Amicus Curiae on behalf of Defendant and Appellant.

Linda F. Robertson and Jennifer Friedman for California Public Defenders Association, California Attorneys for Criminal Justice and Los Angeles County Public Defender as Amici Curiae on behalf of Defendant and Appellant.

Daniel J. Broderick, David Porter and Rachelle D. Barbour for Federal Public Defender of the Eastern District of California and National Association of Criminal Defense Lawyers as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Edward C. DuMont, State Solicitor General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Jeffrey M. Laurence, Assistant Attorney General, Steven T. Oetting and Michael J. Mongan, Deputy State Solicitors General, Max Carter-Oberstone, Associate Deputy State Solicitor General, Joyce Blair, Stan Helfman and Enid A Camps, Deputy Attorneys General, for Plaintiff and Respondent.

Fulbright & Jarowski, Norton Rose Fulbright US, Eric A. Herzog, Tillman James Breckenridge and Jonathan S. Franklin for DNA Saves as Amicus Curiae on behalf of Plaintiff and Respondent.

Steve Cooley and Jackie Lacey, District Attorneys (Los Angeles), Irene Wakabayashi, Steven Katz, Phyllis C. Asayama and Roberta Schwartz, Deputy District Attorneys, for Los Angeles County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Page 2 – S0223698 – counsel continued**

**Counsel:**

Jan Scully, District Attorney (Sacramento), Anne Marie Schubert, Deputy District Attorney; W. Scott Thorpe, Mark Zahner and Albert C. Locher for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Jones & Mayer, Martin J. Mayer, James Touchstone and Deborah Pernice-Knefel for California State Sheriffs' Association, California Police Chiefs' Association and California Peace Officers' Association as Amici Curiae on behalf of Plaintiff and Respondent.

Hill Wallack, Christopher H. Asplen; Newton Rimmel and Ronald F. Rimmel for Global Alliance for Rapid DNA Testing as Amicus Curiae on behalf of Plaintiff and Respondent.

Tony Rackauckas, District Attorney (Orange), Jim Tanizaki and Camille Hill, Assistant District Attorneys, Scott G. Scoville, Tammy Sprugeon, Andrew E. Katz, Katherine David and Nancy Hayashida, Deputy District Attorneys, for Orange County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

J. Bradley O'Connell
First District Appellate Project
475 Fourteenth Street, Suite 650
Oakland, CA  94162
(415) 495-3119

Michael J. Mongan
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-2548